Booth, J.,
delivered the opinion of the court:
The question now before the court arises on claimants’ and defendants’ motion.to amend findings and for a ne-w trial.
This is one of a class of cases involving an alleged taking of private land in the course of the improvement of the Mississippi Biver by the United States in aid of navigation. The original petition was filed in 1894, in which the ad dam-num was stated at $107,257.50. Defendants’ demurrer to this petition was overruled in 1896 (31 C. Cls., 319), since which time three supplemental petitions have been filed increasing the aggregate damages claimed to $569,702.50. The lands of claimants lie on the east bank of the Mississippi Biver, about 40 miles below Natchez, in Adams County, Miss., embracing a total of 4,265.05 acres, segregated by description into four plantations, as follows: Cerro Gordo. Black I-Iills, Alloway, and Wakefield. The petition alleges that prior to the year 1890 said plantations were comparatively high and so situated as to be exempt from the over ■ flow waters of the Mississippi Biver except at long intervals, and that the occurrence of such overflows did not materially affect their productive capacity or their value; that about 1883 the officers and agents of the United States, in pursuance of an act of Congress creating the Mississippi Biver Commission, and by subsequent acts passed to aid in the improvement of the navigation of said stream, have projected and constructed, and are now constructing, a system of public works, consisting of levees and embankments, for the purpose of confining the flood waters of said river between the lines of said levees and embankments, thereby securing an increased elevation and force to the current of said river in *611 order to scour and deepen the channel; that in the prosecution of said work by the officers of the commission, they have adopted and made use of the various State systems of public levees and private levees constructed^ for the reclamation of overflowed lands lying alongside the river wherever the same are available; that on the east side of said river from Vicksburg to Baton Rouge no levees have been constructed, the officers of the commission availing themselves of the highlands skirting the same and have adopted the lands between the levees on the west and the foothills on the east as the channel of the river, and the lands here claimed for lie therein. The petition concludes with a general averment that as a result of the adoption of the Eads plan, involving the reclamation of the flood waters of the river by the erection of levees and embankments and detouring same into its channel, it has thereby increased its flood heights to such an extent as to annually inundate the premises of the claimants, destroying their value as agricultural lands, and leaving thereon a deposit of silt and sand of such proportions as to force their abandonment.
Claimants’ contention rests entirely upon the assertion of a right under the fifth amendment to the Constitution of the United States to compensation for private property appropriated by the United States for governmental purposes. The defendants interpose two defenses. First, that the damages accruing were consequential in character, and second, that the public works complained of were constructed by the cooperation of the United States and the various local authorities, with no means at hand to ascertain the extent of their respective liabilities.
The distinction between consequential damages occasioned riparian owners by the construction of governmental public works in navigable streams, and a taking of private property in furtherance of the same, is most generally a difficult and nice question of law. The rule is well settled that where officers of the United States appropriate to a public purpose the private property of another, admitting it to be such, an implied obligation arises to pay for the same. (South Carolina v. Georgia, 93 U. S., 4; United States v. Great *612 Falls Manufacturing Co., 112 U. S., 645; United States v. Lynah, 188 U. S., 445.)
In Pumpelly v. Green Bay Company (18 Wall., 166) the Supreme Court overruled a contention that a taking of private property within the meaning of the fifth amendment to the Constitution was limited to the identical lands physically taken, and extended the liability in such cases to other lands actually invaded by “ superinduced additions of water, earth, sand, or other material * * * so as to effectually de-story or impair its usefulness.” In the Pumpelly case the lands involved were totally submerged by overflow waters and had been so since the completion of the public works and for at least six years subsequent thereto; they were adjacent to the impediment placed by the defendants across the stream and were so situated that the result of the improvement was to retard the natural flow of the water and accumulate such a volume of same at the situs of the works as to back up the overflow upon and over the plaintiff’s lands. It in effect amounted to a physical invasion and a practical ouster of the plaintiff’s possession. To the same effect are United States v. Great Falls Mfg. Co. (112 U. S., 645); United States v. Lynah (188 U. S., 445); United States v. Williams (188 Ib., 485).
In the Lynah case, supra, a case especially, relied upon by the claimants, the findings show, and from the opinion it is clearly deducible, that it is not a departure from the previous rulings of the court upon this subject. Mr. Justice Brewer, in speaking for the court, says:
“ It is clear from these findings that what was a valuable rice plantation has been permanently flooded, wholly destroyed in value, and turned into an irreclaimable bog, and this as the necessary result of the work which the Government has undertaken.”
While there was dissension as to the full import of the findings, there was no dispute as to the rule of law. Again it is observable that in the Lynah case the improvements complained of were placed in the bed of the river having the same disastrous effects as in the Pumpelly case.
In United States v. Welch (217 U. S., 333) and United States v. Grizzard (219 U. S., 180) the Supreme Court ex *613 tended tbe quantum of compensation recoverable for an actual physical taking of private property under the fifth amendment so as to embrace not only the market value of the lands actually taken, but to the remainder affected by such invasion, including the right of access to a public road destroyed by permanent flooding.
While what constitutes an actual taking is difficult of ascertainment, it is clear from the opinions that to constitute an actual taking there must be an actual invasion of the lands amounting to a practical ouster of claimant’s possession, an actual overflow of such a permanent character as to imply an intent to take, and a correlative obligation to pay for the lands so taken. (Peabody v. U. S., 43 C. Cls., 5.) The Supreme Court has said that “the acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the constitutional provision.” In Transportation Company v. Chicago (99 U. S., 635)—from which the above quotation is taken — the court held the municipality exempt from liability for damages unavoidably caused an adjoining property owner by obstructing a street and a portion of the river in the course of constructing a tunnel under the Chicago Eiver.
Numerous decisions covering the entire scope of consequential injuries as distinguished from a taking under the fifth amendment of the Constitution, are discussed and cited in the case of Heyward v. United States (46 C. Cls., 484); it is unnecessary to again discuss them here.
In Bedford v. United States (192 U. S., 225)—a case of extreme significance to the issue here raised — the Supreme Court in distinguishing the difference between consequential damages and a taking of private lands for public purposes, declined to attach responsibility to the Government for constructing certain improvements in the Mississippi Eiver in such a way as to result in a complete and permanent submerging of certain portions of the claimant’s lands. The findings of the court in the Bedford case disclose the following situation: Prior to 18t6 the channel of the Mississippi Eiver was around a narrow neck of land known as De Soto Point; in the spring of that year De Soto Point, yielding to *614 constant erosion and the force of the current of the river, became so narrow that the river broke through, thereby detouring the main channel from in front of the city of Vicksburg to a distance some miles away in a southerly direction. The effect of this complete change in the channel of the river was to force the water with great velocity against the Mississippi bank at what is known as the cut-off of 1876. • The United States in 1878 and subsequent years, in pursuance of acts of Congress, erected along the new banks of the river near the cut-off some 10,700 feet of revetments, the purpose being to prevent further erosion of the banks of the new-made channel, which, if continued, would necessarily carry the main channel of the river farther away from the city of Vicksburg. In the consummation of this purpose and because of the revetment work the waters of the river were deflected toward the land of the claimant, situated some 6 miles below the same, and subsequently permanently submerged them. In answering the plaintiff’s contention, the opinion uses the following language :
“ The contention asserts a right in a riparian proprietor to the unrestrained operation of natural causes, and that works of the Government which resist or disturb those causes, if injury result to riparian owners, have the effect of taking private property for public uses within the meaning of the fifth amendment of the Constitution of the United States. The consequences of the contention immediately challenge its soundness. What is its limit? Is only the Government so restrained ? Why not as well riparian proprietors ? Are they also forbidden to resist natural causes, whatever devastation by floods or erosion threaten their property? Why, for instance, would not, under the principle asserted, the appellants have had a cause of action against the owner of the land at the cut-off if he had constructed the revetment? And if the Government is responsible to one landowner below the works, why not to all landowners ? The principle contended for seems necessarily wrong. Asserting the rights of riparian property it might make that property valueless. Conceding the power of the Government over navigable rivers, it would make that power impossible of exercise, or would prevent its exercise by the dread of an immeasurable responsibility. ”
We have given at length and in great detail the substantially agreed upon findings respecting the hydraulics of the *615 Mississippi River. The evidence upon which they are predicated consists of the numerous reports of the Mississippi River Commission and various other reports of the authorized officers of the Government in the course of said work. From said findings it is apparent that said stream from Cairo, Ill., to the Gulf of Mexico is one of great sinuosity; its innumerable bends with scarcely a single line of direct current have made it susceptible to great overflows in times of anything like abnormal conditions. In fact, overflows are so frequent, and the use of riparian lands for agricultural purposes so precarious, that it is indispensable to protect them by lines of levees and embankments. The alluvial valley of the river extending from Girardeau, Mo., to the Gulf of Mexico has been divided into six large basins (four on the west bank and two on the east); through the medium of these large and extensive formations the flood waters of the stream have from time immemorial been discharged, passing consecutively from one to the other until they reach the Gulf. Within the limits of the respective basins are millions of acres of alluvial lands which have been at least partially reclaimed by the construction of private levees or their inclusion in local levee districts formed under local laws. These vast drainage basins in their natural state have in themselves been of inestimable value to the riparian owners of lands not situated therein, for the flood waters of the river escaping through them rapidly absorbed the surplus waters suddenly projected upon the higher lands and saved them from extreme injury.
The lands here involved are situated at the southeastern limits of the Lower Tensas Basin opposite what is known as the Bougere Crevasse. They are not protected or reclaimed by levees and lie in that extensive zone some 263 miles in length extending from near Vicksburg, Miss., to Baton Rouge, La., on the east side of the river where the Government has not seen fit to construct any levees or embankments or any other improvements to aid in the navigation of the river, the nearest Government levee to claimants’ land being on the opposite side of the river in the State of Louisiana and the nearest Government levees on the east bank, one being 157 miles north and one 96 miles south in the State of Mississippi. They are alluvial lands situated within the Delta of *616 the river, and have been and of necessity must have been subject more or less to the overflow waters of the river. It is conceded that there is nothing peculiar in their location and that they have always been subject to overflow in times of high water. They lie, it is true, between the banks of the river on the west and the so-called highlands or foothills of the river on the east. The Bougere Crevasse occurred during the flood of 1869, and until it was subsequently closed served in part at least as a channel through which the flood waters upon claimants’ lands were speedily reduced.
The United States in the creation of the Mississippi Biver Commission and the numerous appropriations granted to forward the work, contemplated a most comprehensive scheme involving the reclamation of the flood waters of the river, and by a system of levees and embankments erected upon the banks of either side of the same to prevent its overflow, confine this enormous volume of water in the main channel of the river, thereby securing an increased velocity to the current, which would eventually deepen the channel. The mere assertion is sufficient demonstration that as a result of this project the flood heights of the river would be materially increased, for it is quite apparent that the enormous volume of water previously escaping through these immense basins having been deflected into the main channel of the river would result in causing lands unprotected by levees or embankments tobe subject to more frequent and indeed more serious inundations. In the prosecution of this general plan the United States have made use of and are now using the levees available for the purpose which were constructed by private owners of land or by State and local drainage districts. They have also connected this necessarily disjointed system of levee improvement by constructing new levees and embankments where none theretofore existed, until at present they have substantially a continuous line of levees on the west bank of the river from some distance south of Cairo, Ill., to the Gulf of Mexico, and at such points on the east side as in the judgment of the Engineer officers of the Army serve the purposes of the improvements.
The findings show, and it is conceded, that as a result of the system employed by the United States, in connection with *617 the State and local authorities, the lands of the claimants have been and are now more frequently overflowed than before the construction of the levees. It is indisputable that a large portion of claimants’ plantations have been practically destroyed for agricultural purposes by additional super-induced deposits of silt and sand of sufficient depth to render some portions of them valueless. It is not questioned that the claimants involved have suffered great loss in their inability to annually harvest crops or cultivate to maturity the products usually raised upon said lands.
One contention of the claimants extremely vital to the case, set forth in the petition and emphasized in the briefs, fails for want of proof. It is this, that the Mississippi River Commission has adopted as the main channel of the river from Vicksburg to Baton Rouge the lands between the levees on the west and the highlands on the east, and for this reason have not constructed any levees or embankments on the east side of the river. To sustain this contention the court must indulge an inference from the general plan of the public works. There is an utter absence of any such express intent found in the numerous reports of the commission. The officers of the commission have upon numerous occasions in their reports urged upon Congress some equitable legislative relief for the numerous sufferers in this particular locality, and have described in detail their unfortunate situation and predicament, but we have been unable to find (and certainly can not conjecture) that it was part of the general plan of improvement to appropriate as the channel of the river this most extensive area of private lands extending along the river bank to a total length of some four or five hundred miles, and increasing the width of the channel in some instances more than a mile. The damages would indeed be immeasurable, and the court could not sustain the judgment asked for in the absence of strong and convincing proofs. The testimony to sustain such contention, if it could be sustained, is easily accessible from living witnesses, and so clearly subject to positive proof that inferences and implications from other testimony in the record are unwarrantable. It would indeed be an anomalous proceeding to predicate a judgment for hundreds of thousands of dollars upon an ex *618 parte report found in official reports to Congress of the Mississippi River Commission. The discussion of this subject unanimously approved in the first opinion of the court was sufficient warning to claimants that the court was unwilling to rest this particular contention upon the evidence introduced to sustain it. The intentional taking of a vast acreage of lands is a transaction quite too solemn to depend for adjudication upon indistinct and recommendatory reports, when the transaction itself is so clearly susceptible to positive proof.
The Bedford case establishes that the United States, in the exercise of its plenary power and authority over the navigable streams of the country in aid of commerce and navigation, can by public works resting only against the banks of the channel prevent the same from erosion and preserve its natural identity; that consequences, however injurious, resulting from such procedure are but natural results, consequential in character, and damnum absque injuria. The improvement of the Mississippi River through the instrumentality of a congressional commission manifestly purposed not only the reclamation of the extensive flood waters of the stream, but the erection of such permanent structures along its banks as would prevent the same from erosion and successfully resist the increased velocity of the current and the increased flood heights of the river. The Government was not concerned in the reclamation of riparian lands and was without authority to expend money for the purpose. (Act Mar. 3, 1881; 21 Stat., 468-474.) It was alone concerned in an endeavor to establish settled conditions, throw the escaping flood waters back into their natural channel, and keep them there. It undertook to preserve the channel of the river, the channel the river itself had made in its meanderings from its source to its mouth.
The claimants’ lands, unfortunately situated as were the lands of Bedford, suffered from this improvement in that they were more frequently overflowed than theretofore, and the resultant deposits were more extensive.
The findings show, and it is conceded, that said lands are not and never have been permanently submerged; that in the years 1894-1896, 1900-1902, 1905, and 1910 they were not *619 overflowed at all; that despite partial overflows from 1898 to 1908 the claimants have harvested and sold $328,008.98 worth of cotton therefrom; that as late as the season of 1909 claimant E. H. Jackson had 500 acres in cultivation, and claimant Mattie W. Jackson in 1910 was enabled to realize profit from her plantations which were not overflowed. Aside from the question of permanent submerging, even if same prevailed, the claimants under the authorities cited could not recover. The United States was clearly within the scope of its authority in preserving the banks of the river; and if thereby the perpetual continuance of the great basins of drainage made by the overflow waters of the river which had served as natural outlets for the same were destroyed, it was but the incidental result of the prosecution of the work, and the United States is not to be held liable in damages for pursuing its general plan of improvements alongside the established channel of the river whereby it prevents the water which should be in the channel from escaping elsewhere.
This case is not like the case of Barden v. City of Portage (79 Wis., 126); no artificial structures were placed on or near the claimants’ lands; no waters were deflected toward the same; the public works complained of simply destroyed their existing means of drainage made by the uncertain flow and course of an exceedingly crooked and unreliable water course. Prior to 1859 claimants had no outlet through the Bougere Crevasse. There was no absolute certainty that it would continue to be a means of drainage for the lands, for an unusual flood height, a sudden change in the elevations of the basins, or the making of a new channel by the river itself might have destroyed its usefulness and thereby subjected claimants to injuries as extensive as here claimed for. The United States closed the crevasse by the construction of levees on the banks of the river and the flood waters theretofore escaping through this channel were retarded and remained longer on the claimants’ lands, just as in the Bed-ford case the United States held intact the new-made channel of the river and thereby submerged 2,300 acres of the plaintiff’s lands which would have remained high and dry if the water had continued in its old channel. The fact that *620 claimants’ lands were not so frequently subject to ovei’flow under the natural conditions that existed prior to the construction of the levees does not obligate the Government, in the lawful prosecution of public works in aid of navigation and commerce, to avoid a disturbance of those natural conditions or otherwise incur extensive liabilities.
The facts in the case of Archer v. United States (No. 30471), decided December 4, 1911, are so entirely different from the facts in this case the decision of the court in that case can not apply here. In the Archer case the findings show that the officers of the United States, to protect the channel of the Mississippi River, actually invaded and took possession of more than 31 acres of the lands of Archer and constructed thereon a spur dike, made out of his own soil, some 662 feet in length. The result was to deflect the current of the river over and across the lands of the claimant, in consequence of which they were rendered valueless. The Archer case is similar in most respects to Pumpelly v. Green Bay Co., supra, and Lynah v. United States, supra.
The great basins of the Mississippi reclaimed the lands of riparian owners on the opposite sides of the river from where they were formed and forced those within their limits to erect levees and embankments or abondon their farms for cultivation. The-public works of the United States in the aid of navigation incidentally closed these immense outlets, not in this case by a physical invasion of claimant’s property, not by- appropriating any portion of their soil for levees, nor by proceedings in eminent domain, but by a system of levees built and adopted where previously built on the banks of the river to prevent the water from getting out of the channel and becoming so low as to impede and retard navigation. The bed of the stream was not disturbed; no dams or cross-tide dams, jetties, or other improvements retarded the flow of the water and backed it up and upon claimants’ lands. The United States simply took the banks of the river as they found them and sought to preserve them in statu quo. The condition now is what it would have been had the overflows been restrained long years ago. The character of the work done was not essentially different from dredging; without doubt the govern *621 mental authorities had full power and authority to deepen the channel by dredging, and if they adopted a different means better suited and perhaps more inexpensive, which in effect accomplished the same purpose, the results are the same. Surely it could not be said from the adjudicated cases that the United States is disabled from increasing and preserving from erosion the banks of a navigable stream and thus forestalling by an important improvement the continuance of a condition which if allowed to continue would eventually destroy the usefulness of the river as a commercial highway without incurring, as was said by the court in the Bedford case, “ immeasurable responsibility.” Claimants’ lands from their natural state were burdened with the servitude of a dominant right in the Government of the United States to improve the river in aid of navigation and commerce.
The Mississippi Eiver Commission, in its annual report for 1894 at page 2713, reviews at length the subject of injuries to private lands situated in the alluvial basins of the river. The whole tenor of their observations indicate an apparent indecisiveness as to the extent of responsibility attaching to the United States and the State and local authorities. In speaking of the erection of private levees by the owners of riparian lands in this particular locality, whereby the same could be reclaimed and protected, the commission uses this language:
“ It must be recognized that the result will be to inflict some and perhaps great hardships upon the owners of lands in the unprotected areas described. Just how great the increase of burden cast upon those lands from this cause will be can not now be foreseen. They have always been liable to overflow by the highest floods, and they have always escaped overflow in some years. It is probable that this will continue to be true in the future as in the past. There may be, however, some floods which, unconfined, would not overflow them, but which, confined, will overflow them, and the injury in such case would doubtless be of that immediate and proximate character which constitutes recognized ground of legal redress.
‘‘But the subject is one with which the commission does not feel authorized to deal. In making recommendations for the expenditure of money in the construction of levees it has *622 felt bound to make such application of it as would probably secure the largest aggregate of beneficial results. Some of the minor areas mentioned are large and valuable enough to warrant the expenditure of the money necessary to protect them by levees, while others are not. As to the former, the work is at present simply deferred to await the completion of other work which is considered more important. As to the latter, the construction of levees by the United States would seem to be an expenditure of money merely or mainly for the purpose of repairing a private wrong. This the commission regards as beyond its jurisdiction.”
From the report it would seem that it is not impossible for claimants to protect their lands from overflow by private levees and embankments, and Finding VI shows that it had been done. If so, the duty is cast upon them and the damages claimed thereby materially minimized, if not fully prevented. (Manigault v. Springs, 199 U. S., 473-483.)
It is difficult to see from the record in this case wherein the improvements constructed by the United States on the banks of the Mississippi have resulted in such an invasion of claimants’ lands as to amoimt to a practical ouster of possession. True, they are not in all respects as they were previous to the improvements, and doubtless their cultivation and value have been impaired. No doubt when they were purchased by the present owners a change in the situation as it then existed was not contemplated, but the ownership of riparian lands on navigable waters is always subject to the consequences of governmental improvement of the stream in aid of navigation. (Gibson v. United States, 166 U. S., 269.)
An argument sustained only by' a contrasting of facts in this case with those found in the Bedford case is more than minimized by the fundamental rule of law established by the Supreme Court in the Bedford case. The Bedford case sustains the contention that the power of the United States in making public improvements in aid of navigation and commerce is not limited to a maintenance of natural conditions. If it was, improvements would be valueless and vast appropriations wasted. In this case the Bougere Crevasse, which is in fact the crux of the whole situation, is, as its name implies, a breach in the banks of the river made by the flow of *623 the stream itself. If the Government is powerless under the law to close this breach either by revetment or levee and maintain the integrity of the river banks, then it is difficult to see how efficient public works could possibly accomplish *their designed purposes. The Government has the undoubted right to maintain the stream in its natural condition — i. e., as it would naturally be if these extensive crevasses had never occurred. However advantageous natural crevasses may be for drainage purposes to riparian owners, nevertheless they may be closed by the United States in improving the navigation of a stream in aid of commerce, and if nothing more is done the resulting damages are consequential.
The rulings of the Supreme Court in the Bedford case alone preclude a judgment for the claimants, and the petition is dismissed. It is so ordered.