## UNITED STATES *v.* ARCHER.

### APPEAL FROM THE COURT OF CLAIMS.

No. 112. Argued December 7, 1915.—Decided May 1, 1916.

As questions of fact confront the court before a decision can be reached on the proposition of law herein involved, and the finding of fact on which the court below based petitioner's right of recovery for lands appropriated as a result of construction and extension of dikes by the Mississippi River Commission acting under authority of Congress are not sufficiently definite; this court, without expressing any opinion and reserving all questions of law, remands the case to the Court of Claims, for more particular findings on the testimony already taken or, in the discretion of the court, on further testimony.

*Quære* whether the liability to the owner of a tract of land part of which was taken for erection of a dike in a navigable river is limited to compensation for the area actually occupied by the dike itself under *Bedford* v. *United States*, 192 U. S. 217 and *Jackson* v. *United States*, 230 U. S. 1, or includes compensation for the remainder of the tract destroyed by the deflection upon it of waters of the river by reason of the construction and maintenance of the dike under *United States* v. *Grizzard*, 219 U. S. 180.

47 Ct. Cl. 248, reversed.

PETITION in the Court of Claims for the recovery of $300,000 for damages alleged to have been caused by the officers and agents of the United States under the authority of an act of Congress creating the Mississippi River Commission by the construction and extending of a dike known as the Leland Dike upon the land of petitioners, called the Point Chicot Plantation.

A demurrer to the petition was overruled and after answer and hearing judgment was rendered for claimants in the sum of $54,920, to review which this appeal is prosecuted.

The findings were necessarily voluminous; we condense them narratively as follows: Claimants' plantation prior to the construction of the levee system to the state of completion which now exists was of great value and in a

high state of cultivation, being reclaimed lands comparatively free from overflows of the Mississippi river except at intervals, the recurrence of such overflows being so separated in point of time as not to materially affect either the value or the productive capacity of the plantation.    It was highly improved with houses and cabins thereon and stocked with laborers and tenants and yielded large crops.

It has been overflowed at certain rises of the water in the river (the rise in feet, according to certain data, is given from 1844 to 1910), and during the twenty years following 1891 after the levee system had been made effective there were eight years during which it was not overflowed.

Gauges of the height of the water are taken at Memphis and Greenville.    Claimants' plantation is overflowed whenever the water rises to 135 feet, Memphis datum, and it has been more or less overflowed every year except two years (1872 and 1889) during the eighteen years prior to 1891, up to which time the levee system had not been completed sufficiently to withstand great floods and the outlets unclosed; and during the twenty years following 1891 after the levee system had been made effective and the outlets closed by the United States and the local authorities, there were eight years, namely, 1894, 1895, 1896, 1900, 1901, 1902, 1905, and 1910, during which claimants' land was not overflowed.

The plantation is overflowed at a stage of 38 feet on the Greenville gauge, or whenever the surface water rises to 135 feet, Memphis datum, and the gauge readings show that of the fifteen years from 1882 to 1896, inclusive, there were only four years in which this stage was not exceeded, and that for the fourteen years from 1897 to 1910, inclusive, there were five years in which this stage of 38 feet on the Greenville gauge was not exceeded.

From time immemorial the waters of the river during its

highest stages when not contained within the low-water banks have naturally found outlets through certain basins (they are mentioned) and through the rivers draining them into the Gulf of Mexico. And the plantations that were not overflowed so frequently before such outlets were closed by levee construction were consequently little injured by overflows.

Prior to 1883 the State and local authorities constructed a system of levees, miles of which were destroyed in 1882.

Beginning in 1883 the officers of the United States under the authority of an act of Congress creating the Mississippi River Commission and other acts amendatory thereof adopted the so-called Eads plan, and in consequence thereof have projected and constructed levees on both sides of the river for various distances from Cairo, Illinois, to near the Head of the Passes, a distance of 1050 miles from Cairo; and the local authorities along the river on both sides from Cairo to the Gulf have before and since also constructed and maintained levees at various places and of various lengths for the purpose of protecting and reclaiming land within their respective districts.

The levee lines so constructed by the United States and local authorities have been practically joined, with the result of confining the river within a narrow scope, increasing its velocity and elevation and the strength of its current. The highest elevation is approximately six feet in times of high water, and the plan of the United States was to increase the scouring power of the water, deepen the channel and improve navigation, and that of the local authorities to reclaim and to protect the land on both sides of the river from overflowing at times of high water.

From time immemorial the high-water bed of the river has been between the highlands on the east side and the highlands on the west side and the claimants' plantation is within this boundary, that is, between the highlands on the Mississippi side and the highlands on the Arkansas

side, and has been occasionally overflowed at times of high
water, as stated above, before as well as since the con-
struction of the levees.

From Cairo to the mouth of the Yazoo river the Missis-
sippi river is practically leveed on both sides, except on
the east side where the high lands abut on or very near
the river in Kentucky and Tennessee, and there is a gap
in the line of levees of 234 miles from the mouth of the
Yazoo river to Baton Rouge unleveed.

The extension of the levee system has resulted in an
increased elevation of the general flood levels which sub-
jects claimants' land to a deeper overflow than they were
subjected to formerly and consequently has somewhat
reduced its value for agricultural purposes. The imme-
diate cause of the deeper overflow on claimants' land is
the increased elevation of the flood heights, which is the
result of the general confinement of the flood discharge
by the levee system as a whole.

During the flood waters of 1882 the levees failed through-
out the length of the river. In 1884 the crevasses were still
open in all basins. They were open and closed in subse-
quent years (which are given); they were all closed in 1904
to 1910. In consequence of the closing of the natural
basins, outlets and crevasses, overflowed lands on both
sides of the river have been reclaimed and protected from
overflow in times of high water and vast benefit has ac-
crued to the States of Illinois, Kentucky, Tennessee,
Mississippi, Arkansas and Louisiana, but the land of
claimants, situated between the levees and outside thereof
and not protected thereby, has been subjected to repeated
overflow, tending to diminish and impair its value, but
to what extent does not satisfactorily appear from the
evidence.

A part of the levee system runs back of claimants'
plantation, not touching the same, and between it and
the plantation is a stretch of ground lower than the main

body of the plantation, and in periods of high water the water, rising and passing over and upon said land, has by reason of its lowness first gone thereupon and its main current was across said land and not upon the plantation, which, while in extreme high water it would be flooded, did not have the full force of the current of the river but was covered in part or in whole by slacker water. The current during high-water seasons struck against the levee back of claimants' plantation, eroding and washing it away, to the great danger of its existence and the inundation of the lands to the rear thereof and diverting the water from the channel of the river. A breach or crevasse in the levee would have entailed damage to it and to the adjacent landowners and impaired the efficacy of the levee system as projected, constructed and maintained by the officers of the Mississippi River Commission in accordance with the plans heretofore stated.

In addition to the danger to the levee the current, impinging upon the banks of the stream and the neck of the land adjoining Point Chicot to the mainland, cutting into it, threatened to and would have, if permitted to continue, cut through the neck of land, thus straightening the channel and making the plantation an island.

In order to prevent the threatened danger to the levees and the neck of land the officers of the United States, acting under the authority of the acts of Congress, and the Mississippi River Commission constructed what is known as the Leland Dike, running diagonally and at an angle from the main line of levee on the Arkansas side across and on the land of claimants to a point 662 feet beyond where the line of the plantation begins, their object being to divert the current of the stream during high waters from impinging upon the levee, and, by throwing it northeastward by the dike, to prevent the destruction of the levee and the cutting across the neck of land.

The dike first went into and on the land a distance of

662 feet, but, its end being exposed to the waters of the river and to its powerful current, the officers deemed it necessary to extend the dike a distance of some 2700 feet farther upon the land of claimants and did so extend it in 1907 without any condemnation of the land and with no remuneration therefor being made to claimants. A large part of the soil was used for this construction.

Before the United States joined the levee lines in accordance with the Eads plan, thus making the same continuous, there were occasional overflows of the plantation but they have been made deeper and more forceful by the adoption of such system. But before the erection of the dike the overflows did not materially damage the plantation and it remained still valuable for agricultural purposes. By the extension of the dike the high-water current of the river has been deflected over and across a large part of the plantation, but flows in the same direction as did a portion of the high waters of the river before the erection of the dike—but with greater force and depth—the escape of a portion of the high waters over and across the neck of land being thereby prevented, in consequence of which the overflows of the plantation have been greatly increased and intensified, the result of which has been to wash and scour out its top soil and to deposit upon a large part of the plantation great burdens of sand and gravel, and 3,696 acres have been thereby rendered totally unfit for cultivation or any other profitable use. This result has been caused partly by the joining of the levee systems and the erection of said dike, but directly and proximately by the erection of said dike.

The lines of levees constructed in part by the officers of the United States and in part by the officers and agents of the local organizations of the States bordering on the river to 1909 had a length of 1,548 miles and contained 229,729,354 cubic yards. The officers of the United States constructed 1,050 miles of the total. Since 1909

the authorities of the United States have built additional lines of levees containing 2,970,224 cubic yards and the local authorities lines of levees containing 5,063,427 cubic yards, thus bringing the work of levee construction up to the year 1910.

The 3,696 acres of land damaged as stated was, at the time of the erection of the dike, of the value of $83,920, and 31-4/10 acres of the same is actually and wholly occupied by the United States by the construction of the dike, and the balance, to-wit, 3,664-6/10 acres, has been destroyed and rendered wholly unfit for cultivation or any other profitable use. The land is described.

As an ultimate fact, the court finds, in so far as it is a question of fact, the 3,696 acres of land was somewhat impaired in value by the construction of the levee system, but that its use was totally destroyed by the erection of the Leland Dike and was thereby taken, its value at the time of such destruction and taking being $83,920.

Before this suit was brought George F. Archer, one of the claimants, brought a suit in the United States Circuit Court for the Western District of Arkansas against the Board of Levee Inspectors of Chicot County, Arkansas, for the damages arising from the erection of said dike and the taking of the 31-4/10 acres of land. A demurrer by the defendants to the complaint was overruled (128 Fed. Rep. 125); and thereafter and before the beginning of this suit Archer discontinued the suit brought against the Board.

The ownership of the plantation by the claimants was found. From the findings of fact the court concluded that claimants were entitled to a judgment of $54,920.

*The Solicitor General,* with whom *Mr. Robert Szold* was on the brief, for the United States:

Liability of the Government for damages is limited to

land actually occupied by the Leland Dike. *Jackson Case,* 230 U. S. 1; *Hughes Case,* 230 U. S. 24.

Occupancy of part of claimants' land creates no liability for remote damages to the balance. *United States* v. *Grizzard,* 219 U. S. 180.

*Mr. Percy Bell* for appellee:

Taking and using dike site without condemnation or compensation by the agents, officers, and employees of the Government in improving navigation, or protecting a levee as incident thereto, a virtual trespass and actual taking which creates an undisputed liability.

The superimposition of sand and gravel on adjacent lands of same tract, as the immediate result of the construction of the dike, so as to destroy their value and prevent their use by the owners, is a destruction thereof which constitutes a taking and creates a liability for the value thereof.

The destruction of adjacent lands of owners in same tract, as the immediate result of the dike, and its effect as intended and foreseen by the builders thereof, constitutes a taking and creates a liability for the value thereof.

The value of lands was fixed as of the time of taking.

In support of these propositions, see *Fawcett* v. *United States,* 25 Ct. Cl. 188; *Grant* v. *United States,* 1 Ct. Cl. 41; *King* v. *United States,* 59 Fed. Rep. 9; *M. & C. Ry.* v. *B., S. & T. Ry.,* 18 L. R. A. 166; *Manigault* v. *Springs,* 199 U. S. 473; *Merriam* v. *United States,* 29 Ct. Cl. 250; *Mills* v. *United States,* 19 Ct. Cl. 79; *Morris* v. *United States,* 30 Ct. Cl. 324; *Pumpelly* v. *Green Bay Co.,* 13 Wall. 166; *Sharp* v. *United States,* 191 U. S. 351; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645; *United States* v. *Grizzard,* 219 U. S. 180; *United States* v. *Lynah,* 188 U. S. 445; *Welch* v. *United States,* 217 U. S. 33; *Williams* v. *United States,* 104 Fed. Rep. 50.

The following cases cited by the United States are considered and distinguished: *Bedford* v. *United States,* 192 U. S. 217; *Levee Commissioners* v. *Harkleroads,* 62 Mississippi, 807; *Fort Smith Ry.* v. *Schulte,* 109 Arkansas, 575; *Greenleaf Lumber Co.* v. *Garrison,* 237 U. S. 251; *High Bridge Lumber Co.* v. *United States,* 69 Fed. Rep. 320; *Hughes* v. *United States,* 230 U. S. 24; *Jackson* v. *United States,* 230 U. S. 1; *McCoy* v. *Plum Bayou Levee,* 95 Arkansas, 345; *Peabody* v. *United States,* 231 U. S. 530; *Railroad Co.* v. *Hopkins,* 90 Illinois, 316; *Railroad Co.* v. *Roskemmer,* 264 Illinois, 103; *Railway Co.* v. *Allen,* 41 Arkansas, 431; *Railway Co.* v. *Hunt,* 51 Arkansas, 330; *Richardson* v. *Levee Commissioners,* 68 Mississippi, 539; *Sharp* v. *United States,* 191 U. S. 341; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53.

MR. JUSTICE McKENNA, after stating the case as above, delivered the opinion of the court.

Upon the findings as thus made the parties to the action base opposing contentions. The Government asserts that the Government's liability is limited to the land actually taken and all other damages are consequential. In other words, that the appropriation of the land and the erection of the Leland Dike put the Government in the position of owner of the land with the rights and liabilities of owner, and that besides it had the rights of government to improve navigable waters. There was concession or some concession of the contention by the Court of Claims in its opinion. The court, through Mr. Justice Barney, said:

"In the decision of this case it may be admitted that if the Government had owned the site of the Leland Dike at the time of its erection, or if it had been owned by a stranger to this suit, and hence had made no invasion upon the lands of the plaintiff, it would not have been

liable for the destruction thereby inflicted, under the ruling in the *Bedford Case*." [192 U. S. 217.]

But it was further said: "Under the decisions of the Supreme Court in all cases of this character, it is the invasion upon the lands and the actual and visible possession which constitutes the taking, and when thus taken all of the consequences incident to such invasion necessarily follow, among which is the liability to pay for the damage thereby occurring to the balance of the tract to which the land thus taken belongs." Citing *United States* v. *Grizzard*, 219 U. S. 180.

Claimants concede the power of the Government over the river and that they "do not base their claim upon any raising of the flood levels of the Mississippi River, although it is stated by them and was found as a fact by the lower court that the high-water flood level of the Mississippi River had been raised six feet by the completion of the general levee system."

They "recognize the fact that the right of the United States Government to complete the levee system and maintain the same is indisputable, and that any purely incidental injury which might have resulted to them solely from raising the flood level would be a *damnum absque injuria*. They claim nothing by reason of said fact, adducing the same merely by way of inducement as showing that the ruin, which would inevitably have come to their plantation from the deflecting thereon of the flood waters by the construction of Leland Dike, was merely accelerated and expedited but not caused by the raising of the flood level.

"Their claim is that the deposit of sand and gravel and the destruction of their lands thereby were a direct and immediate result of the construction of the dike which was built on their plantation, using a part of it for the base thereof and the material thereof, and constructing the same without any condemnation of their lands and

ouster of them therefrom, which with the destruction constituted the taking of their lands within the meaning of the Fifth Amendment, and entitled them to compensation therefor."

And they rely on *United States* v. *Grizzard,* 219 U. S. 180, and other cases, and distinguish the *Jackson Case,* 230 U. S. 1, and the *Hughes Case,* 230 U. S. 24.

A serious proposition of law is hence presented by the contentions and controversy arises, as we have seen, whether an appropriation of the land without condemnation proceedings can have different legal results from its appropriation by such proceedings. In other words, whether compensation for the land appropriated in either case would be the only measure of relief, and its payment or recovery transfer ownership of the land and the rights of ownership.

But before reaching decision on this proposition questions of fact confront us. It will be observed that the findings are somewhat involved, mixing statement with inference, indeed, it may be said, even with prophecy. And it may be said again (we say "may be said" to avoid the expression of a definite judgment at this time) that there are effects caused by the United States and effects caused by the State which are not distinguished. We think there should be more precision. Great problems confronted the National and state governments, great and uncertain natural forces were to be subdued or controlled, great disasters were to be averted; great benefits acquired. There might be liability to the individual; if so, the liability should be clear, the cause of it direct and certain. This we explained in *Jackson* v. *United States,* 230 U. S. 1, and in *Hughes* v. *United States, Id.,* 24. There is an effort in the present case to satisfy these conditions, but we do not think it goes far enough.

The finding which recites the effects upon claimants' property is as follows: "In addition to the danger which

threatened the levee [that is, by the concentration of the current and during seasons of high water], said current, impinging upon the banks of the stream and the neck of land adjoining Point Chicot to the mainland, cutting into it, threatened to and would have, if permitted to continue, cut through said neck of land, thus straightening the channel and making Point Chicot plantation an island." In other words, it is found that but for the dike the river would have cut through the neck of land. Or, to express it another way, the dike kept the river in its channel. But, as we have seen, many forces were at work, and if the conditions at claimants' plantation were artificial they were the result of the lawful exercise of power over navigable rivers.

The finding seems to be definite, but it is too broad in its inference. It may indeed be a just inference, but the elements are wanting upon which a judgment can be with assurance pronounced. Besides there were two agencies at work, National and state, in the construction of the levees. There is no distribution of liability; all the results to claimants' plantation are assigned to the Government. Yet it is found that the claimants at one time conceived that the local authorities were the offenders, that is, the Board of Levee Inspectors of Arkansas was alone responsible, and brought an action against the Board. In passing upon the ground of action and its sufficiency challenged by demurrer the court said that the action "was instituted to recover damages alleged to have been sustained by him [Archer] by reason of the trespass of the defendant [the Board of Levee Inspectors], who unlawfully, with force and arms, entered upon his premises—a plantation in the county of Chicot—and built a levee thereon, without having made compensation therefor." The demurrer was overruled, the court expressing the view that the action could be maintained and intimated an opinion that an injunction might have been granted to enjoin the

trespass but that Archer could elect an action for damages.

The action was discontinued. We are not informed by the findings for what reason. It may have been for good reason; we make no intimation to the contrary, but its commencement and subsequent discontinuance suggest some questions which may lead to answers pertinent to be considered. In that action the trespass upon claimants' plantation by the construction of the Leland Dike was attributed to the local levee board; in the action at bar it is ascribed exclusively to the officers of the United States and it is averred that the encroachment of the trespass was at different times, and to a greater extent the second than the first time. Did claimants object at either time? And if not, why not? Upon the answer may depend a serious legal question. Or, if they were silent, why were they silent? What were the local conditions which called for judgment, not only the general conditions to which we have adverted and the findings describe, but the exact conditions as to claimants' property? Did danger threaten it before the erection of the dike as well as threaten the levees? As we have said, great forces were in operation and a judgment or prediction of their effect might have been difficult and uncertain, and claimants have regarded the dike as a protection to their plantation as well as to the levees.

The flow of the river is towards the Gulf and necessarily the water is always higher on the upper side of the reaches or bends such as exist at claimants' plantation. It may be inferred, therefore, that the pressure of the water, compounded of its velocity and volume, is greatest at the recesses or apices of the bends, has its first effect there, but necessarily extends along the whole concave shore. At first, of course, there would be a break at the neck or narrowest part, but would it not successively extend until the whole mass would crumble and a wide breach be

formed through which the river would pour with its full eroding force? And that such might be the effect we gather from the report of the United States engineers, of which we take judicial notice. It certainly may be questioned, therefore, whether the river breaking through at the neck would have confined itself to a narrow channel, "making Point Chicot plantation an island," and would not have permanently submerged it or swept it away. The Leland Dike prevented a demonstration of experience but it would seem that examples elsewhere on the river could give testimony of what would have occurred if the dike had not been constructed. It may be they were adduced, it may be expert testimony was heard and all pertinent facts exhibited to the court, and its finding is a true deduction from the testimony and the facts. We think, however, as we have already said, it is too broad in its inference, and that therefore, the case should be remanded to the court for more particular findings on the testimony in the case or, in the discretion of the court, upon further testimony to be taken; and the case should be given such dispatch as may be consistent with such purposes.

In what we have said no opinion is intended to be expressed of the case as it is presented or may be presented, and all questions of law are reserved.

*Judgment reversed and cause remanded for further proceedings in accordance with this opinion.*

MR. JUSTICE McREYNOLDS took no part in the consideration and decision of this case.

MR. JUSTICE PITNEY, dissenting.

Being unable to perceive that the facts found by the Court of Claims are in any material respect lacking in certainty, or are inadequate to support the judgment of that court, I am constrained to record my dissent.

The salient facts included in the findings are as follows: Claimants' plantation comprises about 6,000 acres, and includes the whole or the greater part of Point Chicot, on the Arkansas side of the Mississippi River. Point Chicot is a peninsula formed by a sweep of the river, being joined at its southwesterly end to the back land by a narrow neck of comparatively low land, which is the property of others than the claimants. The river flows easterly past this neck of land on its upper or northwesterly side, and after flowing around the Point, passing the important town of Greenville, which is on the easterly or Mississippi side, it of course flows past the southerly side of the plantation and of the neck of land, on its way to the Gulf. The distance on the course of the river from the upper side of the neck of land to the lower is approximately 13 miles, while the distance across the neck is less than a mile. The situation is clearly shown upon the map annexed to the findings of the Court of Claims, and reproduced with the report of the case. 47 Ct. Cls. 248, 264.

The findings show that levee construction work of two different kinds has been in progress along the Mississippi River for more than 30 years. On the one hand, the States and local organizations of the States bordering the river on both sides have, both before and since the year 1883, constructed and maintained certain lines of levees at various places and of various lengths, for the purpose of protecting and reclaiming land within their respective districts from overflow in times of high water. The lands of claimants are not included within any such levee district, and are not affected by any state or local levee construction except as such construction has contributed to closing certain natural outlets that formerly accommodated the flood waters of the river, the result of closing the outlets being to raise the elevation of the river in times of high water. On the other hand, beginning about the year 1883, and continuing to the present time,

the officers and agents of the United States, in pursuance of an act of Congress creating the Mississippi River Commission and other acts amendatory thereof, and for the improvement of the river for navigation, have adopted the so-called Eads plan, and in pursuance of it have projected, constructed, and maintained, and are engaged in constructing and maintaining certain lines of levees on both sides of the river at various places; the plan being to increase the velocity. and scouring power of the water, and thus deepen the channel of the river and improve it for navigation.

The findings show that "The extension of the general levee system by the United States and the local authorities has resulted in an increased elevation of the general flood levels, which subjects the claimants' lands to deeper overflow than they were subject to formerly or would be subject to now if the levee system were not in existence, and consequently somewhat reduced its value for agricultural purposes," and this because "the lands of claimants, situated between said levees and on the outside thereof and not protected thereby, have been subjected to repeated overflow, tending to diminish and impair their value, but to what extent does not satisfactorily appear."

It is important to observe that for the diminution of the value of claimants' land thus produced by the general effect of levee construction, State and National, no compensation is claimed from the United States, and no part of such diminution is included in the amount of the judgment awarded by the Court of Claims.

But it came to pass that "a part of the levee system so constructed and maintained runs back of said Point Chicot plantation, not touching the same [whether this was a part of the state or of the National system does not appear from the findings, and is quite immaterial, for it was not this that encroached upon claimants' land or caused an actual invasion of it and direct damage to it],

and that between it and said Point Chicot plantation is a stretch of ground lower than the main body of said plantation [this is the neck of land already mentioned, owned by other parties, and, as the map shows, it extends for nearly a mile from the face of the levee to claimants' nearest boundary line], and in periods of high water, the water rising, passing over and upon said land, has, by reason of its lowness, first gone thereupon, and its main current was across said land and not upon Point Chicot plantation, which, while in extreme high water it would be flooded as hereinabove set forth, did not have the full force of the current of the Mississippi River thereupon, but was covered in part or in whole by slacker water.

"The current during high-water seasons (being) as aforesaid struck against and impinged upon the said levee back of said Point Chicot plantation and protecting the lands on the interior, and such impingement resulted in the waters of said river eroding and washing away said levee, to the great danger of its existence, and threatening to break through said levee and inundate said lands to the rear thereof [not claimants' lands] and divert the water from the channel of the river. Such breach or crevasse in said levee would have entailed damage thereunto and to the adjacent landowners [not to claimants] and impaired the efficacy of said levee system as projected, constructed, and maintained by the officers of said Mississippi River Commission in accordance with the plans heretofore stated. In addition to the danger which threatened the levee, said current impinging upon the banks of the stream, and the neck of land adjoining Point Chicot to the mainland, cutting into it, threatened to and would have, if permitted to continue, cut through said neck of land [owned by others than claimants] thus straightening the channel and making Point Chicot plantation an island."

It is obvious that the straightening of the channel, by permitting the river to make a "cut-off" at the neck of

land, would have sent the principal flow of the river through the shorter route, thus interfering with and probably closing navigation along the 13 miles of river around Point Chicot, to the especial detriment of navigation at Greenville. For it is a well-known fact, and a subject of official comment, that when the river forms a new channel for itself across such a neck of land, the old bed has a tendency to fill up at the head and foot and become a lake. There are many crescent-shaped lakes in the Mississippi bottom-lands, thus caused. Rep. Sec. War, 1875, Vol. 2, Pt. 2, p. 499. In many cases the entire bed along the former and more circuitous channel has been transformed into dry land, or nearly so. Two historic instances of this kind have given rise to interstate suits now pending on the original docket of this court: No. 6 Original, *Arkansas* v. *Tennessee*, turns upon the effect of the "Centennial Cut-off" of 1876, while in No. 10 Original, *Arkansas* v. *Mississippi*, the effect of the cut-off of 1848 is the subject of inquiry. We can thus appreciate the situation, in view of which the powers of the Government of the United States were put forth in the taking of a considerable portion of claimants' land, as is shown by the findings that follow.

In order to prevent the threatened danger to the levees and the neck of land, the officers of the United States, acting under the authority of the acts of Congress, and the Mississippi River Commission, constructed what is known as the Leland Dike, running diagonally and at an angle from the main line of levee on the Arkansas side, across and on the land of claimants to a point 662 feet beyond where the line of the plantation begins, their object being to divert the current of the stream during high waters from impinging upon the levee, and, by throwing it northeastward by the dike, to prevent the destruction of the levee, and the cutting across the neck of land. The dike first went into and on the land of

claimants a distance of 662 feet, but, the end of it being exposed to the waters of the river and to its powerful current, the officers deemed it necessary to extend the dike a distance of some 2700 feet farther upon the land of claimants, and did so extend it in 1907, without any condemnation of the land and with no remuneration therefor being made to claimants. A large part of the soil was used for the construction of the extension.

Before the United States joined the levee lines in accordance with the Eads plan, thus making the same continuous, there were occasional overflows of the plantation, but they have been made deeper and more forceful by the adoption of said system. But before the erection of the dike the overflows did not materially damage the plantation and it remained still valuable for agricultural purposes. By the extension of the dike the high-water current of the river has been deflected over and across a large part of the plantation, flowing in the same direction as did a portion of the high waters of the river before the erection of the dike, but with greater force and depth, the escape of a portion of the high waters over and across the neck of land being prevented by the dike, in consequence of which the overflows of the plantation have been greatly increased and intensified, the result of which has been to wash and scour out its top soil and to deposit upon a large part of the plantation great burdens of sand and gravel, and 3,696 acres have been thereby rendered totally unfit for cultivation or any other profitable use. This result had been caused partly by the joining of the levee systems and the erection of the dike, but directly and proximately by the erection of said dike.

"The 3,696 acres of land hereinbefore mentioned at the time of the erection of the Leland Dike was of the value of $83,920. Thirty-one and four-tenths acres of the same is actually and wholly occupied by the United States by the construction of the dike before mentioned,

and the balance of said 3,696 acres, to wit, 3,664.6, has been destroyed and rendered totally unfit for cultivation or any other profitable use by the owners thereof.   .   .   . The court finds as an ultimate fact, in so far as it is a question of fact, that the said 3,696 acres of land was somewhat impaired in value by the construction of said levee system, but that its use was totally destroyed by the erection of the Leland Dike and was thereby taken, its value at the time of such destruction and taking being $83,920."

Upon these findings, a judgment was rendered in favor of the claimants for $54,920, the difference between this and the total value of the land apparently being represented by an outstanding mortgage.

The record shows that the case was tried and considered with unusual care and deliberation in the Court of Claims. The petition was filed July 19, 1909; final judgment was entered February 17, 1914, *nunc pro tunc* as of February 12, 1912. The merits of the case were argued at least three times, and the United States filed several motions for new trial, for amendment of the findings, etc. It was therefore only after years of contentious litigation that the Court of Claims arrived at the findings and conclusions upon which it based its judgment.

In this court the case has been fully argued upon the facts disclosed by the findings; the argument for the Government being conducted by the learned Solicitor General in person. It was not suggested in argument that the findings were incomplete or wanting in certainty.

That the essential facts clearly appear from the findings is evident from the following excerpt from the Government's brief:

"From the findings of the Court of Claims the following facts appear: The plantation, described as 'Point Chicot Plantation,' is situated in Chicot County, in the

UNITED STATES v. ARCHER. 139

southeastern corner of Arkansas. It is in a bend, bounded
on the north, east, and west by the river. Behind the
Point Chicot Plantation to the south was a levee, a part
of the general system constructed by the United States
and local authorities after 1883, pursuant to the Eads·
plan for the improvement of navigation. Between the
levee and Point Chicot Plantation was a low strip of
ground often covered by the river. The natural current
of the river in high water seasons running over the low
strip of ground behind the Point Chicot Plantation threat-
ened the destruction of the levee, and a severance of the
Point from the mainland, leaving Point Chicot an island.
To forestall the danger to the levee from erosion, and to
the connecting neck of land, and thus to prevent the
river from leaving its channel, agents of the United States
Government constructed the Leland Dike in 1904, run-
ning 662 feet into the Point Chicot Plantation. In 1907
the dike was extended 2,700 feet further on claimants'
land. In all, 31.4 acres were occupied in the construction
of the Leland Dike. . . . In periods of high water the
floods deflected by the dike came over the plantation,
rendering 3,696 acres of the plantation unfit for cultiva-
tion."

Even were it suggested, as it is not, that the Court of
Claims had committed some trial error or had drawn
improper inferences from the evidence there submitted,
this court would have no authority to review the judg-
ment and reverse it upon that ground. The rules es-
tablished by this court, pursuant to § 708, Rev. Stat.
(now § 243, Jud. Code), for regulating appeals from the
Court of Claims require that the record shall contain
"A finding by the Court of Claims of the facts in the
case, established by the evidence, in the nature of a
special verdict, but not the evidence establishing them;
and a separate statement of the conclusions of law upon
said facts on which the court founds its judgment or

decree." The findings are conclusive upon this court unless error of law appear in the record. *United States* v. *Smith,* 94 U. S. 214; *Stone* v. *United States,* 164 U. S. 380; *District of Columbia* v. *Barnes,* 197 U. S. 146, 150.

The entire argument for the Government may be reduced to the single contention that its liability for damages is limited to the 31.4 acres of claimants' lands that are actually occupied by the Leland Dike, and that the Court of Claims erred in awarding compensation also for the 3,664.6 acres destroyed by the deflection upon it of the flood waters of the river through the construction and maintenance of the dike. The simple question is whether the case should be governed by *United States* v. *Grizzard,* 219 U. S. 180, upon which the Court of Claims rested its decision, or by *Bedford* v. *United States,* 192 U. S. 217; and *Jackson* v. *United States,* 230 U. S. 1.

It was attempted to be shown in argument that the causes of the damage to claimants' lands were diverse, it being attributable in part to the levee work of the local and state authorities, and only in part to the construction of the Leland Dike by the agents of the United States Government. It seems to me that the findings render this matter perfectly clear, for they show that while the general work of levee construction in which local, state, and Federal agencies coöperated, resulted in an increased elevation of the flood levels and subjected claimants' land to deeper overflows than before, and consequently somewhat reduced its value for agricultural purposes, no compensation was awarded—indeed, none was or is asked—for this general and consequential result of levee construction. Nor was the judgment in favor of claimants based at all upon the value that claimants' lands would have had but for this levee construction. On the contrary, the finding is explicit that while the tract of 3,696 acres of land was somewhat impaired in value by the construction of the levee system, its use was totally

destroyed by the subsequent erection of the Leland Dike, and that *its value at the time of such destruction* was $83,920.

In view of this, I confess myself unable to comprehend the basis of the criticism that the findings lack precision and that the effects of the work done, respectively, by the States and by the United States ought to be more clearly distinguished. It is not suggested in what respect the findings lack precision, and the Government advances no such contention. The findings certainly render it most clear that no compensation is claimed or allowed for anything done by the state or local authorities; that neither of these has invaded the soil of claimants' lands; that this invasion was done solely by agents of the United States Government, acting under the authority of acts of Congress, in the execution of an important public work; and that by their acts 31.4 acres were actually occupied for the construction of the dike and the balance of the 3,696 acres were destroyed as the direct consequence of the effect of the dike in turning the flood waters of the river upon and across claimants' lands in other than their natural course; and this because the dike performed the very function that it was designed to perform.

Unfavorable reference is made to the finding that, in addition to the danger which threatened the levee, the current, impinging upon the banks of the stream at the neck of land, cut into it, threatening to cut through it and thus straighten the channel and make of Point Chicot plantation an island. I am unable to see in this anything else than a very clear and direct inference based upon the physical facts and the effect of previous floods upon the neck of land as recited in the findings, viewed in the light of a history of cut-offs so frequent and familiar along the lower Mississippi as to have become a matter of common knowledge. But, if the finding is wanting in any respect, this has nothing to do with claimants' right to compensation for the taking of their lands. The

danger to the neck of land connecting Point Chicot with the mainland does not affect the question of the quantity or. value of the land taken from claimants. It bears solely upon the. necessity for the taking. Now, the objection of want of necessity may be appropriately raised by an objecting land owner. But surely it does not lie in the mouth of the Government, after an actual taking of private property, to answer a claim for compensation by setting up that there was no necessity for taking it.

It is said that it may be questioned whether the river, breaking through at the neck, would have confined itself to a narrow channel, making Point Chicot plantation an island, and would not have permanently submerged it or swept it away. Plainly, this is wholly speculative; and it seems to me, in view of the findings and the illustrative map, that the result hinted at is not even a remote possibility. The findings are clear to the effect that, before the construction of the dike, flood waters went across the neck of land, to the relief of the Point Chicot plantation, upon which the ground is much higher. The entire width of the river opposite the neck of land and on its upper side is about one-half mile, perhaps less. As already mentioned, the neck is less than a mile across, and it extends for over a mile from the levee to the nearest line of the Point Chicot plantation.

My brethren deduce an inference of possible extensive erosion from the reports of the United States engineers. The reports at the utmost, would be no more than evidential as to this point. Nor am I aware that this court, in reviewing a judgment of the Court of Claims, is at liberty to seek contradiction of the express findings of fact made by that court by reference to some government publication of which we may take judicial notice.

But if, before construction of the Leland Dike, there was any probability, near or remote, that the opening of a cut-off at the neck of land would lead to any encroach-

ment of the river upon claimants' land, the only possible
legitimate effect of this upon their claim for compensation
for the lands actually taken and directly damaged by the
construction of the dike would be to reduce the damages
to such extent as it should be made to appear that by
such construction claimants had been specially benefited
through the saving of their other lands from destruction.
But the burden of showing this was upon defendant, not
upon claimants. And I can see no justification for re-
versing a judgment, fairly recovered by claimants, upon
the mere conjecture that possibly there ought to have
been an allowance in favor of the United States for the
direct benefit that the dike construction conferred upon
claimants.

Reference is made to the fact that before this suit was
brought George F. Archer, one of the claimants, brought
a suit in the United States Circuit Court for the Eastern
District of Arkansas against the board of levee inspectors
of Chicot County, Arkansas, for the damages arising from
the erection of the dike and the taking of the 31.4 acres
of land, and that after the overruling of a demurrer to the
complaint the action was discontinued before the com-
mencement of this suit (128 Fed. Rep. 125). As a finding
of fact, this manifestly imports nothing whatever pertinent
to the right of action of claimants against the Government
of the United States. As an evidential circumstance,
even were it entitled to any weight, this court has nothing
to do with it, for we have no jurisdiction to consider or
weigh evidence. Even as against the defendant in that
action, the discontinued suit would not estop the plaintiff
therein; and certainly this court does not intend to inti-
mate that it furnishes any bar to the recovery by the
claimants of compensation for the land actually taken by
the Government of the United States.

The question whether claimants objected to the entry
by the officers of the United States is likewise immaterial,

for their suit is based, not upon the ground that the officers were trespassers, but upon the ground that they were lawfully engaged in the construction of a public work under governmental authority, and in the doing of it found it necessary to take and did take a considerable part of claimants' land, with incidental direct damage to another and greater part. This, upon well-settled principles, is to be deemed a taking of private property for the public use, and by the plain mandate of the Fifth Amendment to the Constitution is to be made the subject of compensation. The protest of the property owner is not necessary to entitle him to compensation. Acquiescence in an unauthorized taking may estop a landowner from having equitable relief by way of injunction against the consequences of the taking, or from treating the taking as a trespass; but it does not disentitle him to compensation for the land actually taken. *New York* v. *Pine*, 185 U. S. 93, 96, 103. Nor is the absence of formal condemnation proceedings of any consequence. An agreement on the part of the Government to pay him the fair value of his property is necessarily implied, on principles of justice and equity, from the mere act of taking, and it is upon the implied assumpsit that the action rests. *United States* v. *Lynah*, 188 U. S. 445, 462, 465, 468–470.

Stress is laid upon the suggestion that if the Government or some third party had owned the site of the Leland Dike at the time of its erection, so that in its construction there had been no invasion of the lands of the claimants, the Government would not have been liable for the destruction thereby inflicted. It is quite true that the constitutional inhibition against the taking of private property for public use without compensation has been generally construed as not conferring a right to compensation upon a landowner, no part of whose property has been actually invaded, and who has sustained only consequential damages by reason of the erection of a public work upon

adjoining land owned by a third party. It is this doctrine that underlies the decisions of this court in *Bedford* v. *United States*, 192 U. S. 217; and *Jackson* v. *United States*, 230 U. S. 1. The great hardship of the doctrine has been so generally recognized that many of the States have established constitutions providing in substance that private property shall not be taken *or damaged* for public use without compensation. *Richards* v. *Washington Terminal Co.*, 233 U. S. 546, 554. A rule so harsh in its operation ought not to be extended; and this case very clearly stands on the other side of the line, and comes within a class of cases quite as well established, of which *United States* v. *Grizzard*, 219 U. S. 180, is an example.

I cannot yield assent to the suggestion that the taking of the 31.4 acres, actually invaded and occupied by the construction of the dike, can be treated as a matter apart from the destruction of the 3,664.6 acres of claimants' lands immediately adjoining, which, as a direct result of the construction of the dike and because of the function that it performs, have been "rendered totally unfit for cultivation or any other profitable use by the owners thereof." Assuming, for the purposes of the argument, that if the Government itself, or some stranger, had owned the site of the dike, so that in the erection of it no actual invasion had been made upon claimants' lands, the Government would not have been liable on an implied assumpsit for the destruction thereby inflicted, it is sufficient to say that *that is not this case.* The whole of the lands in question were owned by claimants, and were in use as integral parts of a single plantation. There was an actual invasion and exclusive occupancy of claimants' lands in the construction of the dike, and the destruction of the adjoining lands was a direct and necessary consequence of the use made of the dike, and, in justice, must be regarded as an inseparable part of the taking. It is the established rule, recognized everywhere, that where

only part of a tract of land is taken the owner is entitled not merely to the market value of the part taken, but to all damages to the remainder of his tract proximately resulting from the use made of the part actually taken; or, putting it in another way, he is entitled to the difference between the market value of the entire tract and the market value of that which is left; excluding from consideration, however, any general benefit that is shared by all landowners whose property is similarly circumstanced: A multitude of cases might be cited in support of this proposition, but it is not necessary, for they can be found in the text books and cyclopedias. The doctrine has been uniformly adhered to by this court. In *Bauman* v. *Ross*, 167 U. S. 548, 574, it was expressed thus: "When part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition, as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened." In *Sharp* v. *United States*, 191 U. S. 341, 353, 354, an attempt was made to apply the same rule to separate and independent farms owned by the same owner and having no necessary relation to each other, the farming on each having been conducted separately, and each farm having its own house and outbuildings. The court said: "Upon the facts which we have detailed, we think the plaintiff in error was not entitled to recover damages to the land not taken because of the probable use to which the Government would put the land it proposed to take. If the remaining land had

been part of the same tract which the Government seeks to condemn, then the damage to the remaining portion of the tract taken, arising from the probable use thereof by the Government, would be a proper subject of award in these condemnation proceedings. But the Government takes the whole of one tract." In *United States v. Grizzard*, 219 U. S. 180, 182, 183, which was an action by the owners of a farm for a taking of a part of it by the United States for public purposes, the court said: "Reference has been made to the well-known class of cases touching an injury to land not taken by the construction of a railroad along and upon an abutting public road, or a change of grade to the damage of adjacent property, and like indirect injuries to the use of property adjacent but of which no part was taken from the owner. *Transportation Co. v. Chicago*, 99 U. S. 635; *Sharp v. United States*, 191 U. S. 341. But here there has been an actual taking by permanently flooding a part of the farm of the defendants in error. An incident of that flooding is that a public road running across the flooded land is also flooded. But if this were not so, and the roadway had simply been cut off by the interposition of the flooded portion of the farm, the damage would be the same. Since, therefore, there has been a taking of a part of the owners' single tract and damage has resulted to the owners' remaining interest by reason of the relation between the taken part and that untaken, or by reason of the use of the taken land, the rule applied in the cases cited does not control this case. . . . Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of that part of the tract appropriated, but the damage to the remainder resulting from that taking, embracing, of course, injury due to the use to which the part appropriated is to be devoted."

*Bedford v. United States*, 192 U. S. 217, 225, is clearly

distinguishable, it being an instance of consequential damages to the claimants' land by reason of Government operations conducted six miles farther up the river. There was no actual invasion of any part of their land, and therefore no responsibility for the consequential damages arising from the Government operations. *Jackson* v. *United States*, 230 U. S. 1, 23, was likewise a case of consequential damages without actual taking of any part of the claimant's lands. It was decided both in the Court of Claims (47 Ct. Cl. 579, 613) and by this court upon the authority of the *Bedford Case*.

It seems to me that the findings of the Court of Claims are sufficiently clear and definite to furnish the materials for a proper judgment upon the claim in controversy; that an actual invasion and occupation of a part of claimants' lands, particularly described, by the agents of the United States, in the construction of the dike under the authority of acts of Congress, is shown, as well as the market value of the particular part actually invaded and of the larger and adjacent portion of the same tract necessarily destroyed as a direct and immediate result of the construction and maintenance of the dike. I also think that the case comes clearly within the authority of *United States* v. *Grizzard*, *supra*, and that the judgment under review should be affirmed.

More than eight years have elapsed since the practical destruction of the greater part of claimants' plantation; nearly seven years since the suit was commenced. And as no interest is allowable against the Government in a case of this kind up to the time of the rendition of judgment in the Court of Claims, (§ 1091, Rev. Stat., § 177, Jud. Code; *Tillson* v. *United States*, 100 U. S. 43, 47; *Harvey* v. *United States*, 113 U. S. 243) any unnecessary postponement of the judgment is a virtual denial of justice.

For these reasons, I dissent.