# United States Court of Appeals
# for the Federal Circuit

———————————

**ST. BERNARD PARISH GOVERNMENT, GWENDOLYN ADAMS, HENRY ADAMS, CYNTHIA BORDELON, STEVEN BORDELON, STEVE'S MOBILE HOME AND RV REPAIR, INC., EDWARD ROBIN, SR., EDWARD "PETE" ROBIN, JR., BRAD ROBIN, ROBIN SEAFOOD COMPANY, INC., ROBIN YSCLOSKEY DEVELOPMENT #1, LLC, ROBIN YSCLOSKEY DEVELOPMENT #2, LLC, ROBIN YSCLOSKEY DEVELOPMENT #3, LLC, ROBIN YSCLOSKEY DEVELOPMENT #4, LLC, ROCCO TOMMASEO, TOMMOSO "TOMMY" TOMMASEO, ROCKY AND CARLO, INC., PORT SHIP SERVICE, INC., AND OTHER OWNERS OF REAL PROPERTY IN ST. BERNARD PARISH OR THE LOWER NINTH WARD OF THE CITY OF NEW ORLEANS,**
*Plaintiffs-Cross-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————

2016-2301, 2016-2373

———————————

Appeals from the United States Court of Federal Claims in No. 1:05-cv-01119-SGB, Chief Judge Susan G. Braden.

———————————

Decided: April 20, 2018

_____

CHARLES J. COOPER, Cooper & Kirk, PLLC, Washington, DC, argued for plaintiffs-cross-appellants.  Also represented by BRIAN W. BARNES, VINCENT J. COLATRIANO, MICHAEL W. KIRK, WILLIAM C. MARRA; CARLOS A. ZELAYA, II, Mumphrey Law Firm, LLC, Chalmette, LA.

BRIAN HALLIGAN FLETCHER, Office of the Solicitor General, United States Department of Justice, Washington, DC, argued for defendant-appellant.  Also represented by JOHN C. CRUDEN, BRIAN C. TOTH, Environment and Natural Resources Division, United States Department of Justice, Washington, DC.

MARK F. HEARNE, II, Arent Fox, LLP, Clayton, MO, for amici curiae National Federation of Independent Business Small Business Legal Center, Reason Foundation, Southeastern Legal Foundation, Property Rights Foundation of America, Inc., National Association of Reversionary Property Owners, James W. Ely, Jr. Also represented by STEPHEN SHARP DAVIS, MEGHAN SUE LARGENT.

_____

Before NEWMAN, LOURIE, and DYK, *Circuit Judges.*

DYK, *Circuit Judge.*

Saint Bernard Parish Government and various other owners of real property in St. Bernard Parish or in the Lower Ninth Ward of the City of New Orleans (collectively "plaintiffs") brought suit in the Court of Federal Claims ("Claims Court") under the Tucker Act, 28 U.S.C. § 1491(a)(1), alleging a taking. They claimed that the government was liable for flood damage to their proper-

ties caused by Hurricane Katrina and other hurricanes. Plaintiffs' theory was that the government incurred liability because of government inaction, including the failure to properly maintain or to modify the Mississippi River-Gulf Outlet ("MRGO") channel, and government action (the construction and operation of the MRGO channel). The Claims Court found a taking occurred and awarded compensation. The government appeals, and plaintiffs cross-appeal alleging that the Claims Court's compensation award was inadequate.

We conclude that the government cannot be liable on a takings theory for inaction and that the government action in constructing and operating MRGO was not shown to have been the cause of the flooding. This is so because both the plaintiffs and the Claims Court failed to apply the correct legal standard, which required that the causation analysis account for government flood control projects that reduced the risk of flooding. There was accordingly a failure of proof on a key legal issue. We reverse.

BACKGROUND

New Orleans has a long history of flooding. The geographic location of the city makes it "particularly vulnerable to hurricanes." J.A. 25035. The city was hit by major storms in 1909 and 1915, and much of the city flooded due to the Fort Lauderdale Hurricane in 1947. In 1955, Congress authorized the Army Corps of Engineers ("Corps") to study the need for additional hurricane protection in the Lake Ponchartrain area. This resulted in a comprehensive report known as the "Barrier Plan," which recommended a system of floodgates, levees, and floodwalls to protect the area from hurricanes.

In 1956, Congress authorized the Corps to construct the MRGO navigation channel in New Orleans. The purpose of the channel was to increase commerce by providing a direct connection between the port of New

Orleans and the Gulf of Mexico. Construction was completed in 1968.

Plaintiffs allege that over the course of the next several decades, the construction, operation, and improper maintenance of the MRGO channel caused various adverse impacts that increased storm surge along the channel as follows. The construction, operation, and failure to maintain MRGO increased salinity in the water by providing a direct route for salt water to flow into the area from the Gulf of Mexico. The saltwater changed the character of the marshes and destroyed wetlands in the area that previously acted as a natural buffer against flooding. Moreover, the "failure of the Army Corps to maintain the banks" caused erosion along the banks, which allowed more water to pass through the channel at higher velocities. MRGO also created the potential for a funnel effect, which increased flooding during storms by compressing storm surge into the channel and causing it to rise faster and higher.

In 1965, while MRGO was still under construction, Congress authorized funding to implement the Barrier Plan through the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPV project") to control flooding resulting from hurricanes. *See* Flood Control Act of 1965, Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965). At an estimated cost of approximately $56 million ($447 million in today's money), the LPV project included construction of levees and floodwalls in the St. Bernard basin along the banks of MRGO utilizing dredged material from the MRGO channel. The levee system was designed to, and did, reduce the risk of flooding in New Orleans, including specifically along the banks of MRGO. Construction began around the same time that construction of MRGO was concluding.

Plaintiffs own properties located in the St. Bernard Parish and Lower Ninth Ward areas. These properties

were catastrophically flooded during Hurricane Katrina in 2005. Hurricane Katrina was "one of the most devastating hurricanes that has ever hit the United States, generating the largest storm surge elevations in the history of the United States." *In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 678 (E.D. La. 2009), *aff'd in part, rev'd in part*, 696 F.3d 436 (5th Cir. 2012). Storm surge is a "wind generated process," so "a storm of such intensity creates an immense storm surge." *Id.* at 679. During Hurricane Katrina, as a result of the storm surge, levees from the LPV project around St. Bernard Parish and the Lower Ninth Ward breached, contributing to flooding in the area. Increased storm surge also contributed to subsequent damage from other hurricanes.

Plaintiffs brought an action in the Claims Court under the Tucker Act, alleging that construction and operation of MRGO and failure to properly maintain or modify it constituted a taking by causing flooding damage to their properties. Plaintiffs made no effort to show that the combination of MRGO and the LPV levees caused more flooding than would have occurred without any government action, arguing that the court should limit its consideration to MRGO in isolation.

After a bench trial in December 2011, the Claims Court held that a temporary taking occurred. The Claims Court found, as plaintiffs alleged, that a causal link existed between increased storm surge and MRGO. The construction of, continued operation of, and failure to maintain or modify MRGO caused erosion, increased salinity, wetlands loss, and a funnel effect, which in turn caused increased storm surge. The Claims Court found that "the substantially increased storm surge-induced flooding of Plaintiffs' properties that occurred during Hurricane Katrina and subsequent hurricanes and severe storms was the direct result of the Army Corps' cumula-

tive actions, omissions, and policies regarding the MR-GO that occurred over an extended period of time."[1] *St. Bernard Par. Gov't v. United States*, 121 Fed. Cl. 687, 741 (2015); *see also id.* at 745 ("The evidence in this case established that the substantial increase in storm surge and flooding was the 'direct, natural or probabl[e] result' of the construction, expansions, operation, and failure to maintain the MR-GO."). The plaintiffs presented no evidence, and the Claims Court made no findings, as to whether the combination of these MRGO-related effects and the LPV levees caused flooding on plaintiffs' properties greater than would have occurred had the government engaged in no action at all.

The Claims Court also determined that these environmental effects were foreseeable at least by 2004. The Claims Court found that "it was foreseeable to the Army Corps that the construction, expansions, operation, and failure to maintain the MR-GO would increase salinity, increase habitat/land loss, increase erosion, and increase storm surge that could be exacerbated by a 'funnel effect' and likely cause flooding of Plaintiffs' properties in a hurricane or severe storm." *Id.* at 723.

After a separate trial on compensation in November 2013, the Claims Court awarded compensation of $5.46 million based primarily on the replacement cost of improvements to the properties and lost rental value during the temporary taking period. The Claims Court also sua

---

[1]    However, the Claims Court somewhat inconsistently noted that some evidence suggested that MRGO "did not significantly impact the height of Katrina's storm surge, not because the 'funnel' effect was nonexistent, but because the storm was so great it nullified the impact of either the wetlands or the intersection of MRGO and the GIWW—the funnel—at the height of the surge." J.A. 18361.

sponte awarded lost real-estate taxes to the New Orleans city government, a non-party. The Claims Court then certified a class under Court of Federal Claims Rule 23(a) for purposes of liability and two subclasses for purposes of just compensation.

The government appeals both the finding of liability and the compensation award. Plaintiffs cross-appeal the amount of the compensation award. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003). We review the trial court's legal determinations de novo and its fact-findings for clear-error. *Id.*

I

This is an inverse condemnation case. Inverse condemnation is the means by which a landowner may recover just compensation under the Fifth Amendment for a physical taking of his property when condemnation proceedings have not been instituted. *United States v. Clarke*, 445 U.S. 253, 257 (1980). The inverse condemnation claim here is based on a taking of a flowage easement. It is well established that the government cannot take such an easement without just compensation. *United States v. Dickinson*, 331 U.S. 745, 748 (1947); *Ridge Line*, 346 F.3d at 1352. Most recently, in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 34 (2012), the Supreme Court held that temporary, government-induced flooding may give rise to a claim for the taking of a flowage easement. Thus, the issue presented is whether the increased flooding from MRGO constituted a temporary taking. Proof of such a claim requires the plaintiffs to establish that government action caused the injury to their properties—that the invasion was the "direct, natu-

ral, or probable result of an authorized activity." *Ridge Line*, 346 F.3d at 1355; *see also Arkansas Game*, 568 U.S. at 38–40; *Sanguinetti v. United States*, 264 U.S. 146, 149 (1924); *Moden v. United States*, 404 F.3d 1335, 1342–43 (Fed. Cir. 2005). Establishing liability for a temporary taking also requires proof that the invasion was either intentional or foreseeable. *Arkansas Game*, 568 U.S. at 39; *Moden*, 404 F.3d at 1343.

## II

The Claims Court's finding of liability here is based in large part on the failure of the government to take action, particularly on its failure to maintain MRGO or to modify it. The Claims Court determined that the government's decisions not to armor the banks and not to repair erosion along the banks caused the channel to widen, which allowed MRGO to "carry significantly more water at higher velocities." *St. Bernard Par. Gov't*, 121 Fed. Cl. at 730. The Claims Court also found that "the failure of the Army Corps to maintain the banks" caused expansion that "affected the severity of wave attack on the Chalmette levee." *Id.* at 731. Indeed, each of the Claims Court's causation findings mentions a causal link to the "failure to maintain" MRGO. *Id.* at 726, 729, 731, 733, 738. In finding a causal link between MRGO and storm surge, the Claims Court cited expert testimony noting that there was "no evidence that the MRGO project was ever modified to reduce the predictable excess surge stresses and wave attack." *Id.* at 737. In particular, the Claims Court noted that MRGO's lack of armoring or foreshore protection contributed to erosion along the banks.[2] *Id.* at 700, 729. Thus, the government's failure to

---

[2]    The Corps added foreshore protection in the 1980s, but the Claims Court noted that the decision to defer erosion protection allowed the channel to widen considerably. *Id.* at 692, 729.

properly maintain or to modify the banks played a significant role in plaintiffs' takings theory and the Claims Court's analysis.

While the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim. A property loss compensable as a taking only results when the asserted invasion is the direct, natural, or probable result of authorized government action. *Sanguinetti*, 264 U.S. at 149–50; *Ridge Line*, 346 F.3d at 1355.

On a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government. "The government's liability for a taking does not turn, as it would in tort, on its level of care." *Moden*, 404 F.3d at 1345. Instead, takings liability arises from an "authorized activity." *Id.* at 1338 (citing *Ridge Line*, 346 F.3d at 1355); *see also Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 543 (2005) (explaining that "the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose"); *Cary v. United States*, 552 F.3d 1373, 1377, 1379 (Fed. Cir. 2009); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006); *All. of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for public use without just compensation.").[3] In both physical takings and regulatory takings, government liability has

---

[3]     *See also* 1 George Cameron Coggins & Robert L. Glicksman, *Public Natural Resources Law* § 12:14 ("Takings result from authorized acts by government officials, whereas '[c]hallenges to the propriety or lawfulness of government actions sound in tort.'") (quoting *Thune v. United States*, 41 Fed. Cl. 49, 52 (1998)); 3-8 Nichols on Eminent Domain § 8.01.

uniformly been based on affirmative acts by the government or its agent.[4]

In the flooding context, in particular, both Supreme Court precedent and our own precedent have uniformly based potential takings claims on affirmative government acts. For example, in *Arkansas Game*, the Supreme Court found a temporary taking claim could be based on affirmative actions by the government in releasing water from a government constructed and operated dam that caused downstream flooding on the plaintiff's property. 568 U.S. at 27–28.[5] In *Ridge Line*, the United States Postal Service

---

[4]     *See, e.g.*, *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (taking occurred when government required transfer of title of an unfinished boat, making a lien unenforceable); *United States v. Pewee Coal Co.*, 341 U.S. 114, 116–17 (1951) (taking occurred when government temporarily seized and operated coal mines during war); *United States v. Causby*, 328 U.S. 256, 267 (1946) (taking occurred when military flew planes over a chicken farm at low altitudes); *see also Dolan v. City of Tigard*, 512 U.S. 374, 396 (1994) (taking occurred when city granted building permit on condition that owner dedicate public greenway along stream and allow public access); *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1015–19 (1992) (taking occurred when government regulation completely eliminated economic use of a property); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 841–42 (1987) (taking occurred when state conditioned grant of a building permit on recording an easement to allow public access to the beach); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441 (1982) (taking occurred when state statute required landlords to allow installation of cable TV equipment on the premises).

[5]     *See also United States v. Kan. City Life Ins. Co.*, 339 U.S. 799, 801, 811–12 (1950) (taking occurred when

built a facility that increased storm water runoff onto the plaintiff's property. 346 F.3d at 1351. We held that this government action may form the basis for an inverse condemnation claim. *Id.* at 1355.

In contrast, other cases establish that takings liability does not arise from government inaction or failure to act. In *United States v. Sponenbarger*, 308 U.S. 256 (1939), the government built a flood protection system. The plaintiff complained that the system was inadequate to protect the plaintiff's property from flooding. In finding that there was no taking, the Supreme Court held that "[w]hen undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every land-owner which it fails to or cannot protect." *Id.* at 265. Similarly, in *Georgia Power Co. v. United States*, 633 F.2d 554 (Ct. Cl. 1980), *cert. denied*, 450 U.S. 981 (1981), Georgia Power brought a takings claim asserting the government took its power line easement by permitting sailboat masts to intrude into the portion of the easement over a government reservoir. Finding no takings liability for failure to regulate sailboat mast heights, the Court of Claims explained that "issuance of such regulations is merely a discretionary act, and a taking may not result from this discretionary inaction" absent a duty to act. *Id.* at 527.

---

construction of federal lock and dam raised water level in a river and caused flooding); *Dickinson*, 331 U.S. at 747, 751 (taking occurred when the government built a dam that increased water levels, which flooded plaintiffs' property); *United States v. Cress* 243 U.S. 316, 330 (1917) (same); *United States v. Welch*, 217 U.S. 333, 338–39 (1910) (same); *United States v. Lynah*, 188 U.S. 445, 469, 474 (1903) (same).

Plaintiffs point to no case where the government incurred takings liability based on inaction. Takings liability must be premised on affirmative government acts. The failure of the government to properly maintain the MRGO channel or to modify the channel cannot be the basis of takings liability. Plaintiffs' sole remedy for these inactions, if any, lies in tort.[6]

## III

Here, the sole affirmative acts involved were the construction of MRGO, which was completed by 1968, and the continued operation of the channel.[7] The parties debate whether the injury to the plaintiffs was foreseeable as a result of these actions. We need not reach that question because we conclude that the plaintiffs have

---

[6]    Here, another group of plaintiffs, who owned land in the St. Bernard polder, originally sued in tort but lost. Those plaintiffs brought a lawsuit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671. The plaintiffs initially succeeded on the tort theory at the U.S. District Court for the Eastern District of Louisiana. *See In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644 (E.D. La. 2009). The Fifth Circuit then reversed that holding on the ground that the government was immune from liability under the discretionary-function exception of the FTCA. *See In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (5th Cir. 2012).

[7]    The extent to which plaintiffs contend that the operation of MRGO caused their injury is unclear. At least by 2009, it appears that plaintiffs concede that MRGO's operation was causing them no injury because they alleged that the closure of the channel in that year "made at most a negligible contribution to protecting Plaintiffs' properties from the risk of recurring future flooding." Appellee Br. 78.

failed to establish that the construction or operation of MRGO caused their injury.

It is well established that a takings plaintiff bears the burden of proof to establish that the government action caused the injury. Causation requires a showing of "what would have occurred" if the government had not acted. *United States v. Archer*, 241 U.S. 119, 132 (1916). In order to establish causation, a plaintiff must show that in the ordinary course of events, absent government action, plaintiffs would not have suffered the injury. The burden of proof is on the plaintiff to establish causation. Thus, for example, in *Archer*, plaintiffs claimed that the government's construction of a dike on their property constituted a taking because the construction of the dike caused depositing of sand and gravel on their land. 241 U.S. at 128. Due to the possibility that without the dike, a river may have flowed through plaintiff's property and permanently submerged the property, the Supreme Court remanded the case to determine whether the testimony demonstrated "what would have occurred if the dike had not been constructed." *Id.* at 132. In *Sanguinetti*, plaintiffs brought a takings claim alleging that a canal built by the government caused flooding damage. 264 U.S. at 147. The Court noted the relevance of whether "[t]he land would have been flooded if the canal had not been constructed." *Id.*; *see Danforth v. United States*, 308 U.S. 271, 286 (1939) ("The Government could become liable for a taking . . . by such construction as would put upon this land a burden, actually experienced, of caring for floods greater than it bore prior to the construction."); *see also Arkansas Game*, 568 U.S. at 34.

Our cases are to the same effect. In *Accardi v. United States*, the government built a dam, and after a severe storm with unexpected precipitation, water flowed onto plaintiffs' property. 599 F.2d 423 (Ct. Cl. 1979). The court explained that "plaintiffs have wholly failed to show that defendant's construction or operation of the [dam] sub-

jected their lands to any additional flooding above what would have occurred in consequence of the severe . . . storm had defendant not constructed the [dam] at all." *Id.* at 429–30. The court then held that "[i]n these circumstances, there has been no taking of plaintiffs' property." *Id.* at 430.[8] Thus, the causation analysis requires the plaintiff to establish what damage would have occurred without government action.

Here, the plaintiffs failed to present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all.[9] The plaintiffs' proof of causa-

---

[8]    *See also Bartz v. United States*, 633 F.2d 571, 577 (Ct. Cl. 1980) (finding no taking when "excessive precipitation was the root cause of the flooding experienced by plaintiffs," and in most instances, flooding "would in all likelihood have happened without the existence of the upstream dam"); *ARK-MO Farms, Inc. v. United States*, 530 F.2d 1384, 1386 (Ct. Cl. 1976) ("No proof was made that [the dam] or any other consequence of the [government] project was the cause of the floods complained of. This failure of proof would alone dispose of plaintiff's case."); *Coates v. United States*, 110 F. Supp. 471, 475 (Ct. Cl. 1953) (no taking where "plaintiffs have not been able to establish that the land would not have been flooded had there been no dikes").

[9]    We note that, though it was excluded during the just-compensation portion of the trial, the government presented evidence that "[i]f the Mississippi River Gulf Outlet (MRGO) had never been built, or if the MRGO had remained at its original design dimensions, the flooding of the Trial Properties east of Paris Road would have been virtually identical to the flooding that actually occurred on those properties during Hurricane Katrina. For the Trial Properties located west of Paris Road, the maximum

tion rested entirely on the premise that it was sufficient to establish that the plaintiffs' injury would not have occurred absent the construction and operation of the MRGO channel without taking account of the impact of the LPV flood control project. Plaintiffs on appeal are clear that in their view the LPV levees cannot be considered in the causation analysis. Plaintiffs argue that the Claims Court "properly analyzed whether Plaintiffs' properties would have flooded absent MRGO, not whether they would have flooded absent both MRGO and the LPV levee system." Appellee Br. 17.

The result is that plaintiffs failed to take account of other government actions—specifically the LPV project including the construction of a vast system of levees to protect against hurricane damage—that mitigated the impact of MRGO and may well have placed the plaintiffs in a better position than if the government had taken no action at all.[10] In other words, the plaintiffs addressed the wrong question—asking not whether the whole of the government action caused the plaintiffs' injury, but rather

water elevations would have been 1–3 feet lower." *St. Bernard Par. Gov't*, 126 Fed. Cl. at 717; *see also* J.A. 15812–13, 16213–17.

[10] The LPV project apparently prevented the flooding of St. Bernard from other hurricanes before Katrina. St. Bernard polder did not flood during Hurricane Camille in 1969, although other areas in New Orleans flooded during that storm. *St. Bernard Par. Gov't*, 121 Fed. Cl. at 704. Moreover, after Hurricane Katrina, minimal flooding occurred inside the levees during Hurricane Gustav in 2008, although that hurricane caused flooding outside the levees. *Id.* at 714. Of seventy-seven properties located within the federal levee system, sixty-two only flooded once (during Hurricane Katrina) after the LPV project was authorized. J.A. 10857–58.

whether isolated government actions, the construction and operation of MRGO, caused their injury. And the Claims Court's causation findings took no account of the risk-decreasing impact of the LPV levee construction. *St. Bernard Par. Gov't*, 121 Fed. Cl. at 724–38.

The plaintiffs' approach to causation is simply inconsistent with governing Supreme Court and Federal Circuit authority, particularly in flooding cases. These cases establish that the causation analysis must consider the impact of the entirety of government actions that address the relevant risk. In *Sponenbarger*, the plaintiff owned land that was in a contemplated floodway of a government flood control plan, and the plaintiff alleged that the government plan caused flooding on it. 308 U.S. at 260. The plaintiff's land was a natural floodway that had flooded in the past, and the land would have flooded but for other government work done under the flood control plan. *Id.* at 263–64. The Court stated "[t]he Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted." *Id.* at 266. The Court explained that to hold the government liable for "damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the Government undertaken no work of any kind" would "far exceed even the 'extremest' conception of a 'taking' by flooding within the meaning of the Fifth Amendment." *Id.* at 265. It further made clear that "[t]he far reaching benefits which respondent's land enjoys from the Government's entire program" had to be considered. *Id.* at 266–67. Thus,

> [e]nforcement of a broad flood control program does not involve a taking merely because it will result in an increase in the volume or velocity of otherwise inevitably destructive floods, where the program measured in its entirety greatly reduces the general flood hazards, and actually is highly

> beneficial to a particular tract of land. . . . [I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty. Such activities in substance take nothing from the landowner.

*Id.*

Similarly, in *John B. Hardwicke Co. v. United States*, 467 F.2d 488 (Ct. Cl. 1972), the government built two dams as part of a flood control project. The first dam decreased the risk of flooding on the plaintiff's property, while the second dam increased the risk of flooding. The court explained that overall "the expectation of flooding was still far less than it would have been if there had been no flood control program at all" and concluded the government was not liable for a taking. *Id.* at 490–91; *see also ARK-MO*, 530 F.2d at 1386 (finding no taking when a government flood control program was "at most 'little injury in comparison with far greater benefits conferred'" (quoting *Sponenbarger*, 308 U.S. at 267)).

More recently, in the remand decision of *Arkansas Game*, we clarified that the appropriate analysis for causation considers all government actions. *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1372 n.2 (Fed. Cir. 2013). As discussed above, in that case, the government built a dam and then released water (a deviation from policy) that flooded the plaintiff's property. We explained that "the proper comparison would be between the flooding that occurred prior to the construction of [the dam] and the flooding that occurred during the deviation period," emphasizing that the causation analysis considers causation based on the entirety of

government action, not merely the deviation from the original water-release policy. *Id.*[11]

This principle has been applied outside the context of takings induced by flooding. In *Cary*, a hunter set a fire when visiting a national forest, and the fire spread onto plaintiffs' properties. 552 F.3d at 1375. Plaintiffs alleged that certain government fire-suppression policies and visitor policies caused the fire and constituted a taking because the policies increased the risk of fires. In explaining that a takings plaintiff must show that the injury is the "direct, natural, and probable result" of government action, we explained that "government action" includes all of the government's actions. *Id.* at 1377 n.*.

There, the government action included "a long sequence of decisions, some risk-increasing but others risk-decreasing, spread out over decades." *Id.* at 1379. We rejected plaintiffs' attempt to "cherry-pick parts of the [government] policy which they argue[d] ha[d] increased the risk of wildfire since 1911 without acknowledging that much of the [government] policy over the last century ha[d] been devoted to reducing the risk of wildfire." *Id.* at 1377 n.*. We explained that "each risk-decreasing action in the Forest Service's policies is an intervening act breaking whatever causal chain would lead from an accused risk-increasing action to the conflagration which destroyed the landowners' property." *Id.* at 1379. Thus, the causation analysis must consider both risk-increasing and risk-decreasing government actions over a period of

---

[11] In *Arkansas Game*, the original water-release policy (before the deviation) mimicked the pre-dam water flows. Therefore, comparing the flooding that occurred with the deviation to the flooding that would have occurred under the original water-release policy, rather than to what would have occurred before the dam was built, had no impact on the outcome. 736 F.3d at 1372 n.2.

time to determine whether the totality of the government's actions caused the injury.

Plaintiffs argue that even if in some circumstances the totality of government action must be considered in determining causation, such consideration is unnecessary if the beneficial government action is unrelated to the detrimental government action. Here, they contend that the relevant beneficial government action must be part of the same project and that "[t]he Government cannot defeat Plaintiffs' claim by pointing to benefits provided by the separate LPV project." Appellee Br. 54. That is not correct.

To be sure, in determining causation, government actions must be directed to the same risk that is alleged to have caused the injury to the plaintiffs. Here, there is no question that the LPV project was directed to decreasing the very flood risk that the plaintiffs allege was increased by the MRGO project. The LPV project was directly concerned with flood control; it was authorized under the Flood Control Act of 1965. *See* Pub. L. No. 89-298, 79 Stat. 1073, 1077 (1965). The LPV project included levees along the banks of MRGO, and the construction of the levees used some of the material dredged from MRGO. The levees built under the LPV project decreased the risk of flooding in the area, including on plaintiffs' properties. Avoiding flooding damage was the very objective of the system of levees.

The relatedness of the MRGO and LPV projects is re-inforced by the theory that the taking occurred because MRGO caused breaches in the levees. The plaintiffs' claim rests on the assertion that the MRGO project undermined the LPV government flood-control project. Plaintiffs argue that "[a]bsent MRGO, the levees would not have breached, or at a minimum, would have breached later; notably, other levee segments that were not located near MRGO, and thus not exposed to destructive MRGO

waves, did not suffer extensive breaching." Appellee Br. 11, *see also id.* at 51–53, 62.[12] In the causation analysis, the Claims Court noted that a problem with MRGO was that it rendered flood-control projects at least partially ineffective, quoting expert testimony that MRGO exposed the LPV levees to "greater stress . . . for a longer period" during Hurricane Katrina and that "all of the LPV structures that breached were adjacent to some part of the MRGO project." *St. Bernard Par. Gov't*, 121 Fed. Cl. at 737.

When the government takes actions that are directly related to preventing the same type of injury on the same property where the damage occurred, such action must be taken into account even if the two actions were not the result of the same project.

In arguing that the other government actions only need to be considered if they are part of the same project, plaintiffs rely on authorities not directed to causation, but rather concerned with the extent of the economic injury sustained by the plaintiffs or the amount of a just compensation award. In assessing economic loss for regulatory takings, the entirety of government action must be considered. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 113–14 (1978).[13] And in determining just

---

[12]    *See also* J.A. 10344 ("[MRGO] led directly to both greater and earlier breaching of the levees than would have otherwise been the case, which in turn had grave implications for the flooding of the developed areas within the St. Bernard polder."); J.A. 10355.

[13]    *See A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1157–59 (Fed. Cir. 2014) (holding that to prove economic loss based on a government requirement that automobile manufacturers terminate their dealer franchises as a condition of receiving federal assistance during bankruptcy, the dealership owners must show that the

compensation, offsetting benefits may be considered. *See, e.g.*, *United States v. Miller*, 317 U.S. 369, 375–77 (1942). But there, benefits generally must flow from the same government action. Plaintiffs primarily rely on *City of Van Buren v. United States*, 697 F.2d 1058, 1061–62 (Fed. Cir. 1983), for the proposition that offsetting benefits may be considered only where land is enhanced in value by the same project for which it is condemned. However, the discussion of offsetting benefits in *Van Buren* did not involve an issue of causation. In that case, the government closed a dam, which raised groundwater levels and caused the plaintiff's sewer system to flood. *Id.* at 1059. The court determined that "closure of the dam in fact caused [plaintiff's] having to replace [pipe] lines." *Id.* at 1060. The other benefits from closing the dam, such as bank stabilization, flood control, and lowered costs for river transportation, did nothing to mitigate the risk of groundwater levels rising, which caused the flooding. *Id.* at 1061. And on the issue of economic injury, the government had not shown offsetting benefits specific to the plaintiff's property rather than the public at large that would render the injury to the plaintiff's property de

---

franchises would have retained some value without the government's financial assistance to the automobile manufacturers); *Cienega Gardens v. United States*, 503 F.3d 1266, 1282–83 (Fed. Cir. 2007) (explaining that the Claims Court erred by "fail[ing] to consider the offsetting benefits that the statutory scheme afforded which were specifically designed to ameliorate the impact of the prepayment restrictions" in a statute); *see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225–26 (1986) (noting that, in determining the economic impact of a statute alleged to constitute a taking, it is relevant that "a significant number of provisions in the Act . . . moderate and mitigate the economic impact of an individual employer's liability.").

minimis compared to the benefits conferred on the property. *Id.* at 1062.

We are aware of no case, and the plaintiffs have cited none, where the government has taken action that creates a risk of flooding and subsequent government action designed to mitigate that risk can be ignored in the causation analysis.[14] That is what the plaintiffs have done here. When government action mitigates the type of adverse impact that is alleged to be a taking, it must be considered in the causation analysis, regardless of whether it

---

[14] *John B. Hardwicke* suggested that if the risk-reducing government action preceded the risk-increasing action, the risk-reducing action would only be considered in assessing causation if the risk-increasing action was "contemplated" at the time of the risk-reducing action. 467 F.3d at 490–91. In this respect, the court relied on the *Miller* doctrine, which holds that when the project for which property is condemned also confers benefits, the plaintiff cannot recover just compensation for those benefits. *Miller*, 317 U.S. at 375–77. The *Miller* rule only applies to benefits that arise from the same government project for which the property is condemned. *Id.* Whether the *John Hardwicke* approach is correct or whether the *Miller* doctrine is even relevant to determining causation is not raised in this case. The *John Hardwicke* approach would only be relevant if the LPV project had been constructed before MRGO. *See Van Buren*, 697 F.2d at 1061 ("[A]pplication of the '*Miller* doctrine' necessarily presupposes that the property owner seeks to recover the increment in property value effected by a federal project *prior* to condemnation.") Here, the risk-increasing action (MRGO) was constructed before the risk-reducing action (LPV project), and in any event, MRGO was certainly contemplated when the LPV levees were built.

was formally related to the government project that contributed to the harm.[15]

Indeed, the plaintiffs themselves admit that other un-related projects have to be considered in the causation analysis. In the compensation decision, the Claims Court determined that the temporary taking ended on the date that MRGO closed. However, plaintiffs argued, and continue to argue on appeal, that the taking did not end when MRGO closed, but instead when the government built a new "risk reduction" levee system. Plaintiffs argue that the flooding risk "ended (at the earliest) on June 1, 2011, when the Corps substantially completed the new HSDRRS 'risk reduction' levee system with its new robust levees and floodwalls and massive multi-billion dollar surge barrier." Appellee Br. 78. This risk-reduction levee system is a new, separate project. Strikingly, the plain-tiffs' own characterization of the temporary taking demonstrates that the totality of government action is relevant to the takings inquiry, regardless of whether individual construction projects were authorized under separate congressional legislation.

Under the correct legal standard, plaintiffs failed to establish that government action, including both the construction of MRGO and the levees, caused their injury. By their own admission, they have failed to consider the

---

[15] Plaintiffs also argue the burden was on the gov-ernment to establish the "offsetting benefit" from the levees, relying on our decision in *CCA Associates v. United States*, 667 F.3d 1239 (Fed. Cir. 2011). That decision did not change the well-established rule that proof of causa-tion lies with the plaintiffs, but rather addressed whether the plaintiffs must demonstrate the absence of mitigating factors in order to prove economic injury. *Id.* at 1245.

impact of the risk-reducing LPV project.[16] Thus, there was a failure of proof on the key issue of causation. Because plaintiffs failed to show that government action, including both MRGO and the LPV project, caused their injury, the government is not liable for a taking under the Fifth Amendment based on the construction or operation of MRGO.

## CONCLUSION

In summary, we conclude that the allegations of government inaction do not state a takings claim, and that plaintiffs have not established that the construction or operation of MRGO caused their injury. In light of our disposition, we do not reach the other issues.

**REVERSED**

---

[16] It appears that a few of plaintiffs' properties are outside the federal levee system. But even as to those, the plaintiffs failed to show their properties would not have flooded absent MRGO or absent the combination of MRGO and the federal flood-control program. These properties routinely flooded, even before Hurricane Katrina and before the construction of MRGO was completed. J.A. 10389 (explaining that these properties "flooded during each of the five hurricanes that have struck the area since Betsy on September 10, 1965").