NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**BOARD OF SUPERVISORS OF ISSAQUENA COUNTY, MISSISSIPPI,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2026

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01415-LAS, Senior Judge Loren A. Smith.

---

Decided: August 4, 2023

---

PATRICK WAYNE PENDLEY, Pendley, Baudin & Coffin, Plaquemine, LA, argued for plaintiff-appellant. Also represented by JOHN DEAKLE, RONALD JOHNSON, IV, Deakle-Johnson Law Firm, Hattiesburg, MS.

BRIAN C. TOTH, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by TODD KIM.

---

Before DYK, BRYSON, and STARK, *Circuit Judges*.

DYK, *Circuit Judge*.

The Board of Supervisors of Issaquena County, Mississippi (the "Board") sued the United States in the Court of Federal Claims ("Claims Court"), alleging that actions or inactions by the United States led to flooding in 2018 and 2019 that damaged the Board's property and destroyed private property and reduced economic activity, thereby depriving the county of tax revenue.  The Board sought compensation for the damage under the Takings Clause of the Fifth Amendment of the U.S. Constitution.  The Claims Court granted the government's motion to dismiss, holding that the Board's complaint failed to state a takings claim. Although we hold that the Board's complaint failed to state a claim, we will exercise our discretion to permit the Board to seek leave from the Claims Court to amend its complaint.  We therefore *affirm in part* and *vacate and remand in part*.

## BACKGROUND

"At this stage in the proceedings, we accept the [Board's] well-pleaded factual allegations as true," and "may also look to matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (internal quotation marks, modifications, and citations omitted).

I

Issaquena County lies on the southern edge of the Mississippi Delta, an alluvial valley stretching approximately from the Tennessee-Mississippi border in the north to Vicksburg, Mississippi in the south.  The Mississippi and Yazoo rivers converge on the east bank of the Mississippi just north of Vicksburg to form a Y shape, with the Mississippi running from the northwest and the Yazoo running

from the northeast. The county is located in between those rivers.

The Delta has often been flooded by its surrounding rivers, at times compounded by storms resulting from its proximity to the Gulf of Mexico. *See United States v. Sponenbarger*, 308 U.S. 256, 260 (1939) ("[O]ccupation of the alluvial valley of the Mississippi has always been subject to this constant hazard [of flooding]."). When a river overflows its banks, the result is known as headwater flooding. Backwater flooding, by contrast, happens when a river, such as the Mississippi, rises more than a tributary such as the Yazoo, causing the tributary's water to surge until it matches the height of the dominant river. There is no issue here of damage from Mississippi headwater flooding. Instead, the Board claims damage that allegedly resulted from the government's construction of gates and levees to prevent backwater flooding, which had the consequence of interfering with the natural drainage of floodwater created by excessive rainfall.

In 1927, the Delta was struck by the Great Flood, which displaced more than 600,000 people, inundated 16 million acres of land, and inspired the Delta Blues classic "When the Levee Breaks." During the Great Flood, the Mississippi was 80 miles wide at Vicksburg, just south of Issaquena County.

Congress responded in 1928 by authorizing the Army Corps of Engineers (the "Corps") to carry out a "comprehensive ten-year program for the entire [Mississippi] valley, embodying a general bank protection scheme, channel stabilization and river regulation, all involving vast expenditures of public funds." *Sponenbarger*, 308 U.S. at 262; *see also* Flood Control Act of 1928, Pub. L. No. 70-391, ch. 569, 45 Stat. 534, 535, 537; First Amended Compl. ¶ 17, Board of Supervisors of Issaquena County v. United States, 160 Fed. Cl. 300 (2022), ECF No. 9 ("Amended Complaint"). The program resulted in the construction of additional Mississippi River levees.

The government recognized that the improved Mississippi levees, by retaining more water in the river, led to more flood risk in the area between the Mississippi and Yazoo rivers known as the Yazoo Backwater Area ("Area"). *See* M. C. Tyler et al., Flood Control on the Lower Miss. River, H.R. Doc. No. 77-359, at 37 (1st Sess. 1941). In 1936 Congress approved a plan to construct an additional channel, known as the Eudora Floodway, to direct overflow from the Mississippi to, ultimately, the Gulf of Mexico. *See id.* at 11, 30; 33 U.S.C. § 702a-2. In 1941, however, Congress "abandoned" the floodway and instead funded the creation of a new levee system to protect the Area from backwater flooding. *See* Flood Control Act of 1941, Pub. L. No. 77-228, § 3, 55 Stat. 638, 642–44 (codified as amended at 33 U.S.C. §§ 702a–702m).[1] The resulting Yazoo Backwater Project ("Backwater Project") was completed in its current form in 1978.

The mainline levee system built up after the Great Flood runs parallel to the Mississippi. The Backwater Project extended the levees from the confluence of the Yazoo and Mississippi rivers for about 30 miles to the northeast, running parallel to the Yazoo, where another set of levees picks up.

---

[1]    *See also* U.S. Army Corps of Eng'rs, 2020 Final Supplement No. 2 to the 2007 Final Supplement No. 1 to the 1982 Yazoo Area Pump Project Final Environmental Impact Statement, Appendix G ("2020 EIS Appx. G"), ¶¶ 2–3, https://www.mvk.usace.army.mil/Missions/Programs-and-Project-Management/Project-Management/Yazoo-Backwater-Project/Yazoo-Backwater-Report/FileId/303749/.

## II

In this case, the Board alleged in its complaint that the government's "design, construction, maintenance and subsequent operation" of the Backwater Project led to flooding of the Board's land, which constituted a taking under the Fifth Amendment. Amended Compl. ¶ 6. According to the Board, the Backwater Project uses levees and floodgates to protect the Area from backwater flooding. *See id.* ¶¶ 19, 22. Before the Backwater Project was built, the Yazoo River played an important role in draining rainfall from the Area. *Id.* ¶ 18. "The levees constructed as part of the Yazoo Backwater Project altered and cut off this natural drainage in order to protect the area from flooding during high flood stages along the Mississippi and Yazoo Rivers and the resulting backwater inundation that occurred." *Id.* To prevent rainfall from accumulating behind the levees, the Backwater Project uses the floodgates at the Steele Bayou Control Structure to allow water to drain out of the Area. *See id.* ¶¶ 19, 22. When the water is high on the Mississippi and Yazoo rivers, however, the floodgates "must remain closed to prevent backwater flooding," and "any additional precipitation that falls within the 4,093 square mile drainage area becomes trapped behind the Yazoo Backwater levee system and unable to drain." *Id.* ¶ 19.

So if there is both backwater flooding from the Mississippi and extensive rainfall inside the Area between the mainline and Backwater Project levees, "the Yazoo Basin essentially becomes a bathtub with no effective drainage mechanism," and there is nowhere for the water in the Area to go except onto dry land. *Id.* ¶ 20. To address that possibility, after building the levees and floodgates the Corps planned to construct a pump system to remove excess water from the Area. *See id.* ¶ 19. The Corps never built the pumps. *See id.*

From late 2018 through the summer of 2019, the Mississippi flooded and heavy rainfall fell in the Area. *See id.* ¶¶ 22–23. The Corps kept the Steele Bayou Control

Structure gates closed for months to keep out the floodwaters from the Mississippi. *See id*. ¶ 22. The rainwater was trapped behind the levees, with "no outlet through which to drain into the Mississippi River, Yazoo River, or anywhere else," and inundated approximately 550,000 acres in the Area by May 2019. *Id*. ¶¶ 22–23. "Approximately 687 residential homes and hundreds of additional structures were damaged or destroyed by the floodwaters," and "roads, bridges, culverts and other governmental infrastructure within Issaquena County" were flooded. *Id*. ¶¶ 23–24. The flooding also damaged "roadbeds, ditches, levees, and other drainage structures" in the county, forced the local government to take emergency actions to keep its transportation infrastructure working, and resulted "in a severe reduction of the [county's] tax revenue." *Id*. ¶ 24.

## III

On June 1, 2021, the Board sued the United States in the Claims Court, asserting that the "affirmative acts or inactions of the U.S. Army Corps of Engineers . . . resulted in an unlawful taking of [the Board's] lands under the Fifth Amendment of the United States Constitution." Original Complaint ¶ 3, Board of Supervisors of Issaquena County, 160 Fed. Cl. 300, ECF No. 1. The Board amended its complaint in October 2021 to add more detail about the damage it alleged it had suffered as a result of the taking. *See* Amended Compl. ¶¶ 25–26. According to the Board, it amended its complaint in part because the government wanted the Board to list all the roads, culverts, and bridges that were allegedly destroyed by the flooding. Oral Arg. at 34:07–28.

The United States moved to dismiss the case for failure to state a claim, and the Claims Court granted the motion. First, the Claims Court found that the Board alleged that government inaction—failure to install the pumps and build the Eudora Floodway—caused flooding in the Area. Relying on the Supreme Court's decision in *Sponenbarger* and our decision in *St. Bernard Parish Gov't v. United*

*States*, 887 F.3d 1354 (Fed. Cir. 2018), the court held that government inaction cannot be the basis of a takings claim. *See* J.A. 4–6. Second, the Claims Court found that the Board alleged that government action—building the Backwater Project and shutting the Steele Bayou Control Structure gates—caused flooding. *See* J.A. 6–7. But because the Board had not alleged that the government caused worse flooding than that which would have occurred in the absence of government action designed to prevent flooding, the Board had not adequately pled a takings claim. *See id.*

The Board appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

We review dismissals by the Claims Court for failure to state a claim de novo and "must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). To survive a motion to dismiss, "the complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *A & D Auto Sales*, 748 F.3d at 1157 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (secondary quotation marks and citation omitted)).

The Takings Clause guarantees that the government will not take private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. The Supreme Court has long held that "government-induced flooding can constitute a taking." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) (citing *Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871) and *United States v. Cress,* 243 U.S. 316 (1917)); *see also Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021).

## II

On appeal, the Board has suggested three theories of recovery. The first theory does not state a takings claim, and the second theory was not adequately pled. The third theory is also not adequately pled in its present form, but we conclude a potential amendment might clarify the complaint so that it adequately states a claim.

First, the Board alleged that the flooding at issue was caused by the government's failure to build pumps in the Backwater Project, or to construct an alternative drainage system. *See, e.g.*, Amended Compl. ¶¶ 19, 21, 26. Those allegations cannot state takings claims. Throughout its amended complaint the Board referred to both the government's "affirmative acts or inactions" as the source of the alleged taking, *see id.* ¶¶ 3, 6, 26, and asserted that "[b]ecause the pumps were never completed, an estimated 687 homes were flooded during the Yazoo Backwater Flood of 2019," *id.* ¶ 21. But as we have held, "[t]akings liability must be premised on affirmative government acts." *St. Bernard Parish*, 887 F.3d at 1362; *see also* Oral Arg. at 11:59–12:26 (Board counsel agreeing with the court that "[f]ailure to put the pumps in doesn't state a takings claim"). The government's failure to install pumps or to construct an additional floodway cannot result in takings liability.

Second, the Board suggests on appeal that the original government projects to shore up the Mississippi levee system after the Great Flood—built before the Backwater Project—were "expected [to] increase flood heights" on the Mississippi, requiring "additional flood protection for the Yazoo Backwater Area." Appellant's Br. 5 (internal quotation marks and citation omitted). The Board in its complaint made no claim based on a theory involving the flood control measures on the Mississippi undertaken almost a century ago. Indeed, the Board's claim for relief rested entirely on the Corps' actions vis-à-vis the Backwater Project's construction and operation, rather than any earlier

government actions. *See* Amended Compl. ¶¶ 29–30; *see also* Appellant's Br. 3 (summarizing the Board's allegations as relating solely to the Backwater Project). The only claims the Board even attempted to state involved government actions beginning no earlier than 1941.

Third, the Board alleged that the Corps' construction and operation of the Backwater Project led to flood damage. *See* Amended Compl. ¶¶ 6, 19–23, 27, 29–30. But the Board in its complaint never plausibly explained how the Backwater Project, which indisputably protects the Area from backwater flooding, *see id.* ¶ 18, led to worse flooding than would have occurred in its absence. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must therefore present "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021).

As we held in *St. Bernard Parish*, the crucial causality question in cases like this is whether "the flood damage that actually occurred" was worse than "the flood damage that would have occurred if there had been no government action at all." *St. Bernard Parish*, 887 F.3d at 1363. That analysis "must consider the impact of the entirety of government actions that address the relevant risk" by assessing whether the plaintiff's damage was greater than it would have been if the government had not acted to "prevent[] the same type of injury on the same property where the damage occurred." *Id.* at 1364, 1366.[2] The Board's

---

[2]    *See also Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1372 n.2 (Fed. Cir. 2013) (holding that "the proper comparison" for causation analysis was

allegations here do not currently allow us to draw the reasonable inference that the United States is liable for such but-for damage.

As discussed above, the Backwater Project is a series of levees and floodgates that shield the Area from backwater flooding from the Yazoo river. As shown in the Corps-produced map below, of which we take judicial notice, the mainline levees generally guard the Area against flooding from the Mississippi river to the west and the Backwater Project generally blocks flooding from the south and east.[3] The Corps allows water to drain out of the leveed Area by opening the Steele Bayou Control Structure gates when water on the landside is at a minimum height and higher than the water on the riverside. When water is higher

---

"between the flooding that occurred prior to the construction of [the government dam that plaintiff argued led to flooding] and the flooding that occurred during [the time of the asserted taking]"); *Sponenbarger*, 308 U.S. at 266–67 ("[I]f governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty.").

[3]    The map is reproduced, as annotated by the court to circle the location of the Steele Bayou Control Structure, from U.S. Army Corps of Engineers, Final Supp. No. 1 to the 1982 Yazoo Area Pump Project Final Environmental Impact Statement, Appx. 4 (2007), https://www.mvk.usace.army.mil/Missions/Programs-and-Project-Management/Project-Management/Yazoo-Backwater-Project/Yazoo-Backwater-Report/FileId/259737/, at plate 4-1. Levees are marked on the map with dark lines. We may take judicial notice of it because it is "accurately and readily [discernible] from sources whose accuracy cannot reasonably be questioned." *Apple Inc. v. Qualcomm Inc.*, 992 F.3d 1378, 1384 (Fed. Cir. 2021) (quoting Fed. R. Evid. 201(b)) (alteration in original).

outside than inside the levee, "the flood gates at the Steele Bayou [C]ontrol [S]tructure must remain closed to prevent backwater flooding."  Amended Compl. ¶ 19.



The Board does not appear to dispute that the Backwater Project protects Issaquena County from backwater flooding. *See* Amended Compl. ¶¶ 18–19. But it nevertheless avers that the Backwater Project led to flooding because it prevented rainwater from draining out of the Area when the gates were closed. *See* Amended Compl. ¶¶ 20–23, 27. The Amended Complaint on its face does not plausibly allege any flooding of the Board's land greater than would have taken place if the Backwater Project had not been built.

To start, as the Board effectively admits, if the Backwater Project had not been there, the Area would almost certainly have been struck with backwater flooding in 2018 and 2019. At that time, "the Mississippi River experienced the longest extended period of near record-high stages since the Great Flood of 1927," and "the gates at the Steele Bayou [C]ontrol [S]tructure were forced to remain closed for months to prevent Mississippi River water from entering and flooding the Yazoo Backwater Area." *Id.* ¶ 22. The complaint thus appears to concede that absent the Backwater Project, backwater flooding would have entered the Area. The Board has never alleged that the Backwater Project made Mississippi river flooding worse.

Nor does the complaint in its present form plausibly explain how the construction of the Backwater Project could have led to worse rainwater flooding than would have occurred in its absence. Though the Board alleges that the Backwater Project prevents the Area from naturally draining into the Mississippi and Yazoo rivers, *id.* ¶ 18, it suggests that this is only a problem "when high flood stages along the Mississippi and Yazoo Rivers coincide with excessive rainfall events within the Yazoo Basin," *id.* ¶ 20. But when the Mississippi and Yazoo rivers are high enough to force the gates closed, no rainwater could drain out of the Area with or without the Backwater Project. *See id.* ¶¶ 19, 22. So the current complaint does not plausibly explain how the Project's existence in that scenario could worsen rainwater flooding.

For similar reasons, the Board has not explained how the Corps' operation of the Backwater Project worsened flooding. The complaint focuses on the government's decision to keep the Steele Bayou Control Structure gates closed when the Mississippi was in flood. *See id.* ¶¶ 22, 27. But as the Board concedes, opening the gates during that time would only have "exacerbated" the flooding. *See* Oral Arg. 34:44–35:03 (Board counsel conceding that the Corps could not "open the gate[s] in 2019 . . . when the . . . riverside was higher than the landside . . . because that would have exacerbated [the flooding in the Area]"); *see also* Amended Compl. ¶ 22.

For the first time on appeal, the Board attempts to remedy this gap, arguing that the government is systematically increasing flood risk by preventing the Backwater Area from draining when the Mississippi is not in flood. With sufficient factual content, such a theory might present a plausible allegation of but-for causation as to the flooding at issue. But there is no specific allegation in the Board's complaint that the Backwater Project made things worse by blocking water from draining during non-flood periods. *See id.* ¶¶ 22, 27 (blaming rainwater flooding largely on the government's decision to close the floodgates, not the Project's general retention of water in the Area).

The Board also seeks to distinguish *St. Bernard Parish* on the grounds that that case was decided after trial, while here the Claims Court dismissed the case on the pleadings. But as we have held in the regulatory takings context, takings plaintiffs must plausibly plead but-for causation to survive a motion to dismiss. In *A & D Auto Sales*, we explained that because "there can be no regulatory taking without a showing of but-for decline in value, a takings plaintiff must . . . allege sufficient facts in its complaint to show what use or value its property would have had." 748 F.3d at 1157. Likewise, there can be no physical takings liability without a showing of "what would have occurred if the government had not acted," *St. Bernard Parish*, 887 F.3d at 1362 (internal quotation marks and citation

omitted).  A takings plaintiff, whether alleging a physical or a regulatory taking, must allege sufficient facts in its complaint to show the value of its property but for the government's actions.  *See A & D Auto Sales*, 748 F.3d at 1157; *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged.") (quoted with approval in *Twombly*, 550 U.S. at 563 n.8).

In the alternative, the Board argues that its pleading meets the requirements of *St. Bernard Parish*.  We are not persuaded.  For example, the Board averred that once the Backwater Project was in place "without the pumps, the Yazoo Basin essentially [became] a bathtub with no effective drainage mechanism, and the United States knew or should have known this type of [rainwater] flooding event was likely to occur."  *Id*. ¶ 20.  The Board further alleged that "[r]outing the drainage of the entire Yazoo Basin to the Steele Bayou Control Structure, and allowing the floodgate to remain closed, created a massive pool of water for which there is no drain."  *Id*. ¶ 27.  To the extent these allegations rest on the government's failure to install the pumps, they fail to state a claim, as previously discussed.  To the extent that the Board is alleging that the construction of the Backwater Project caused flooding, the complaint fails to explain (or even directly allege) how the Project brought about a worse result than would have occurred anyway.

The Board also suggests that even if its Amended Complaint did not adequately allege but-for causation, it has explained its theory of but-for causation in its appellate brief, relying in part on an engineering report prepared by the Corps for administrative purposes unrelated to this litigation.  The Board also tells us that by the time it filed its Amended Complaint it had retained a hydrological expert and a civil engineer.  The hydrological expert was prepared

to opine that flooding is of a greater depth and duration as a consequence of the government's actions. *See* Appellant's Br. 22–23. These expert reports were not submitted in the Claims Court, and are not part of the record.

If the Board had articulated in its Amended Complaint all that it has argued to us, including its explanation of how the Project could have physically exacerbated flooding in the Area, that might have been sufficient to allege but-for causation. *See, e.g.*, Appellant's Br. 7 ("Plaintiff's property has experienced flooding which is of a greater depth and duration than if the government had taken no action at all."), 12 ("[T]he construction and operation of the Yazoo Backwater Project . . . has resulted in more severe and prolonged flooding of Plaintiff's lands."); 22 ("[E]ven when the Steele Bayou gates are fully open, the water is unable to evacuate as quickly as it naturally would had the Government taken no action in the Yazoo Backwater Area."). Incorporation of the Corps' engineering report into the complaint, paired with sufficient explanation of its relevance, may likewise have pushed the Amended Complaint "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680. The report states, for example: "After the significant rainfall in the last week of February [2019], elevations on the Mississippi River at Vicksburg and the Steele Bayou riverside started to fall. However, the Steele Bayou flood control structure gates remained closed throughout March, preventing the Yazoo Backwater to drain." 2020 EIS Appx. G ¶ 68. Taking all reasonable inferences in favor of the Board, the report might be read as supporting a finding that the government's construction of the Steele Bayou Control Structure and its decision to keep its gates closed made the flooding worse than it would have been if the government had never even built the Backwater Project. However, the Board did not make any allegations in its Amended Complaint based on the report or its retained experts. Nor did it include even a single sentence explicitly making the express allegation that the flooding experienced following the government's actions was worse than

the flooding that preceded it, resulting in the Board's damage.

In evaluating the sufficiency of a complaint, we generally do not consider new arguments made on appeal that are not included in the complaint. *See Kimble v. United States*, 991 F.3d 1238, 1244 (Fed. Cir. 2021). We will not, therefore, make an initial determination as to whether a complaint that adds some or all of what the Board has identified to us would be sufficient to state a claim. But we are persuaded that the Board should have an opportunity to pursue such an assessment from the Claims Court in the first instance.

Although the complaint failed to state a claim, in our discretion we think it appropriate to allow the Board to ask the Claims Court to consider an amended complaint that would explain how the construction and operation of the Backwater Project led to increased flooding compared to a world in which the Project had not been built. *See Mittleman v. United States*, 104 F.3d 410, 417 (D.C. Cir. 1997) (sua sponte remanding to allow plaintiff to "refine" unclear portion of complaint); *Garlick v. Quest Diagnostics Inc.*, 309 F. App'x 641, 643 (3d Cir. 2009) ("[T]he courts of appeals have the inherent authority sua sponte to order a district court to grant a plaintiff leave to amend her complaint where portions of the pleading are less than pellucid in ways that frustrate application of the relevant law."). Although the Board did not seek leave from the Claims Court to file a second amended complaint, and did not expressly ask us for a remand for that purpose (until the issue came up at oral argument), the Board has now expressed its interest in seeking to amend. *See* Oral Arg. 7:39–8:40.[4]

---

[4] Also at oral argument, the government objected to granting leave to amend the complaint, citing party presentation principles and noting that the Board failed to

Ordinarily, we would not grant any relief under such circumstances. *See Taylor v. United States*, 959 F.3d 1081, 1091 (Fed. Cir. 2020) (finding, in takings case, no abuse of discretion where Claims Court did not permit amendment that was never requested of it and was first mentioned on appeal). The Claims Court did not abuse its discretion here, and not even the Board suggests it did. Nonetheless, in these unusual circumstances—where the plaintiff's allegations in its brief on appeal may be sufficient to state a claim and where the government does not assert meaningful prejudice—we believe that we can appropriately exercise our discretion to provide the Board an opportunity to seek leave to amend one last time and attempt to state a plausible takings theory based on government action. *See A & D Auto Sales*, 748 F.3d at 1158–59 (granting leave to amend where plaintiffs failed to plead economic loss while making clear they intended to establish loss of value); *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (noting that Federal Rules of Civil Procedure provide for "a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities

---

file a motion for leave to amend or ask for such relief in its appellate brief. *See* Oral Arg. at 20:04–21:13. The Board's failure to seek leave appears to have been an unintentional forfeiture, not a deliberate waiver, and courts may *sua sponte* consider forfeited positions. *See United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (citing *Wood v. Milyard*, 566 U.S. 463, 471 & n.5 (2012)); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("There are no doubt circumstances in which a modest initiating role for a court is appropriate.").

We think it plain that the Board did intend to plead that the government's actions in constructing and operating the Project caused worse flooding damage than would otherwise have occurred. But the Board failed to adequately make these allegations in its original or amended complaints.

that might keep plaintiffs out of court" (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002))); 6 Charles Alan Wright et al., *Federal Practice & Procedure* § 1473 (3d. ed., April 2023 update) (A "basic polic[y]" of the Federal Rules is "that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits.").

We do not require that the Claims Court allow such amendment. We intend only to require the Claims Court to consider whether such amendment should be allowed under the typical standards governing amendments under Rule 15(a)(2) of the United States Court of Federal Claims. We therefore vacate the Claims Court's dismissal and remand for proceedings consistent with this opinion.[5]

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**

COSTS

No costs.

---

[5]    There is an additional issue presented by the complaint here that we do not reach: whether expected tax revenue is a compensable property interest under the Takings Clause. *See, e.g.*, 2 Julius L. Sackman et al., *Nichols on Eminent Domain* § 5.03[6][f][iii] (3d ed. 2023) ("A tax[ing] [authority] does not have a compensable interest in a property taken by eminent domain." (capitalization altered)); *United States v. 6,321 Acres of Land More or Less In Suffolk Cnty.*, 479 F.2d 404, 406 (1st Cir. 1973) (recognizing the "the general rule making non-compensable [under the Takings Clause] an expectation of taxes"); *Adams v. United States*, 391 F.3d 1212, 1225 (Fed. Cir. 2004) (declining "to treat a statutory right to be paid money as a legally-recognized property interest").